**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| *versus* | : | CRIMINAL NO. 25-181-JWD-EWD |
| | : | |
| EVODIO MERIDA-TAVERA | : | |

**UNITED STATES' TRIAL BRIEF ON ASSAULTING, RESISTING, OPPOSING, IMPEDING, INTIMIDATING, OR INTERFERING WITH A FEDERAL OFFICER**

**I.      INTRODUCTION**

On December 11, 2025, the Defendant, Evodio Merida-Tavera, made a *decision* to force an escape and endanger federal law enforcement with his Ford Mustang, a vehicle that weighs over 3000 pounds. Border Patrol agents were in the process of detaining the Defendant for being in the United States illegally and had parked a large white Jeep Wagoneer, which is a full-size SUV, behind the Defendant.

The Defendant knew this. In fact, he gave a statement to the FBI about one hour afterwards and said, "they closed my way." And, during that statement, after he parked the vehicle, the Defendant actually pointed with his righthand to where the rearview mirror would be and said, "I see them," referring to federal law enforcement.

Nevertheless, knowing that an impact would be inevitable and unavoidable, the Defendant decided to accelerate into a confined space with federal law enforcement present and crashed his car into the front end of the large white Jeep Wagoneer.  At the moment of impact, one Border Patrol agent was directly behind the Mustang; on the body camera footage his shadow can be seen on the trunk, and he was about a step or two from getting hit.

1

Accordingly, on December 17, 2025, a federal grand jury in the Middle District of Louisiana indicted the Defendant for violating Title 18, United States Code, Section 111(a)(1) and (b). The indictment charges that the Defendant, while using a motor vehicle as a dangerous weapon, intentionally and forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with officers and employees of the United States Border Patrol, while they were engaged in the performance of their official duties. A bench trial is scheduled to begin on June 23, 2026.

Notably, during his statement to the FBI, the Defendant minimized his actions. He said he did nothing wrong, and laughed when asked why he fled, replying, "who wouldn't?" In light of that, it is worth noting that the Supreme Court has noted that with 18 U.S.C. § 111 Congress intended to provide federal officers protection to the maximum extent possible. *See United States v. Arrington*, 309 F.3d 40, 46 (D.C. Cir. 2002) citing (*United States v. Feola*, 420 U.S. 671, 684 (1975)). Furthermore, in recognizing this Congressional intent, the Court noted that federal officers are sworn to uphold laws irrespective of their popularity. *United States v. Feola*, 420 U.S. 671, 684 (1975) ("From the days of prohibition to the days of the modern civil rights movement, the statutes federal agents have sworn to uphold and enforce have not always been popular in every corner of the Nation"). In contemporary times, and in this case, federal law enforcement need that same protection during immigration enforcement, regardless of its popularity.

The United States now submits this brief to advise the Court on the facts and law relevant to this case. Below is a preliminary summary of the expected evidence and the statutory framework of 18 U.S.C. § 111(a) & (b) and its elements. Also, relevant legal issues are discussed, such as that the statue can be violated through any of its manner and means and assaultive conduct is not required, that force is required to violate the statute with an analysis of the meaning of force in context of the statute, that 18 U.S.C. § 111 is a general intent statute, that the statue does not

require a defendant to know that a victim was federal agent, that a vehicle can be utilized as a deadly weapon, and that no injury is required for the 18 U.S.C. § 111(b) deadly or dangerous weapon enhancement to apply. Also, evidence demonstrating the defendant's intent is outlined, and the law pursuant to Federal Rules of Evidence 608(b) is provided, which would allow the defendant to be cross-examined, should he testify, on specific instances of his conduct relating to truthfulness.

## II.    PRELIMINARY SUMMARY OF EXPECTED EVIDENCE

On December 11, 2025, and within the Middle District of Louisiana, United States Border Patrol agents were conducting immigration enforcement operations. Border Patrol Agent-1 and Agent-2, as referred to in the indictment, were utilizing an unmarked rental vehicle but were wearing body armor containing badge, agency insignia, and clear police markings on the front and back. That rental vehicle was a full-sized SUV; more specifically, a large white Jeep Wagoneer that was approximately 6,000 pounds, over 6 feet tall, and over 17 feet long.

Near the rear parking lot of the shopping center, located around 5445 Bluebonnet Blvd., Baton Rouge, LA, the Border Patrol agents detained an individual for being in the United States illegally. The agents secured that individual in the rear of the large white Jeep Wagoneer with Agent-2, while Agent-1 was the driver. The agents were parked in the rear parking lot when the defendant then drove into that parking lot in a Ford Mustang. The individual detained in the large white Jeep Wagoneer informed the agents that the defendant was in the country illegally.

The defendant drove the Ford Mustang around the large white Jeep Wagoneer and parked in a parking space; several days later, on a recorded phone call from the East Baton Rouge Parish

Prison on December 14, 2025, the Defendant's statements indicated, that before he parked, he was aware of the large white Jeep Wagoneer and that he had been signaled to go into the parking space.[1]

After the Defendant pulled into the parking spot, Border Patrol Agent-1 positioned and parked the large white Jeep Wagoneer behind and perpendicular to the Defendant's vehicle to prevent him from leaving. Parked next to the Defendant's vehicle, on the drivers' side, was an orange vehicle, and parked next to that vehicle on the other side of it, was a Dodge pickup truck with two Immigration and Customs Enforcement (ICE) agents. Notably, one of those ICE agents had observed the Defendant looking around when the Defendant drove around the large white Jeep Wagoneer and parked the Ford Mustang.

After Border Patrol Agent-1 parked the large white Jeep Wagoneer behind the Defendant's Ford Mustang, Agent-1 exited the vehicle in order to detain the Defendant. As Agent-1 was approaching the defendant, the defendant made several *decisions*. Several bad decisions, that amount to a crime. The defendant decided to put the Ford Mustang in reverse. The Defendant decided to turn the wheel of the Ford Mustang. And then, the Defendant decided to hit the accelerator.

As Border Patrol Agent-1 was approaching the defendant, his body camera captured the sound of the engine of the Ford Mustang revving. Then, the Ford Mustang reversed and about half of the rear end of the Ford Mustang crashed into the front end of the large white Jeep Wagoneer.[2] At the moment of impact, you can see Border Patrol Agent-1's shadow on the trunk of the Ford Mustang; if he had been a step or two closer, he would have been hit by the Ford Mustang.

---

[1] Based on surveillance footage, Agent-1, who was wearing his body armour, was visible through the front windows of the large white Jeep Wagoneer.

[2] The United States plans to offer expert testimony in the form of crash reconstruction, and video analysis including in context of the perception of force.

At the same time, Border Patrol Agent-2 was in the large white Jeep Wagoneer. Both Agent-1 and Agent-2 feared for their safety.

Nearby surveillance footage[3] captured the incident, depicting the Defendant driving around the large white Jeep Wagoneer and parking, Border Patrol Agent-1 parking behind the Defendant, and then the crash. Before the crash, the front wheel on the drivers' side of the parked large white Jeep Wagoneer is straight. During the crash, that front driver wheel is knocked to a noticeable angle outward from the SUV, and that large Jeep Wagoneer, that's over 6000 pounds, can be seen shaking.[4]

Approximately 10 seconds passed from when the Defendant parked and the moment of impact, ample time to make a lawful decision. At the moment of impact, the ICE agents were still exiting the Dodge pickup truck, and the orange vehicle was between them and the Defendant, but soon thereafter they assisted Border Patrol Agents in detaining the defendant. When the defendant was detained, his demeanor was composed and not consistent with panicking.

About one hour after the collision, the Defendant, after being advised of his *Miranda* rights,[5] gave a statement to the FBI. The tone of the interview was conversational, respectful, and polite, with the Defendant showing no signs of distress. The interview was conducted in English, and the Defendant demonstrated his English proficiency by continually providing sensible and context-appropriate responses.

During the interview, the Defendant indicated he had spent 17 years in the United States illegally, but continued to state he did nothing wrong and was apprehended for no reason.

---

[3] The footage was provided by the defense from the Defendant's employers; admittedly, it is a recording of a recording, there are voices in the background, and the user skips around on the video, but it does depict the crash.
[4] After the crash, the large white Jeep Wagoneer was misaligned, and the steering was impaired. The vehicle had to be repaired.
[5] A Border Patrol Agent advised the defendant of his *Miranda* rights in Spanish at the scene, and the FBI advised him of his rights in English at their office.

Nonetheless, during the interview, the Defendant did admit that he knew the agents were law enforcement, had vests on that said "police," and were attempting to take him into custody because he was in the country illegally. When explaining what happened, the Defendant said that, after he stopped, "they closed my way."  As he said that, the Defendant made an encircling motion with both hands. Then, despite a collision being inevitable and unavoidable, the Defendant said "I tried to run away." When asked, "Why did you try to run if you did nothing wrong?"  The Defendant laughed and replied rhetorically, "Because who's going to stay?"

The defendant was asked to explain what happened a second time; an opportunity to elaborate further. The Defendant's nonverbal communications, in particular, during this part of the interview also show he was aware law enforcement officers were behind the Mustang. The Defendant said the following,

> The first thing that happen, okay. I stopped. *(\*Defendant points to the side with right hand\*)* When I stopped, I see them. *(\*Defendant raises right hand and points toward rearview mirror\*)* Because, it was like maybe four cops, maybe like four different cops. And so, they tried to close my way. *(\*Defendant makes encircling motion with both arms\*)* They closed my way. So, when I see them, I say these the guys catch people. So, I get in reverse. *(\*Defendant makes turning motion with both hands\*)*. I tried to run away.

During the FBI interview, the Defendant never stated or suggested that his conduct was accidental or unintentional. In fact, during the interview, he acknowledges, "maybe it's my mistake."

At the end of the interview, the FBI Agents asked if there was anything else the Defendant wanted to add or say. Again, the defendant never mentioned that his conduct was accidental or

unintentional. Just like he never mentioned that his conduct was accidental or unintentional at the scene of crash,[6] when Agent-1 conversed with him in Spanish.

Neither does the Defendant say it was an accident in his first couple jail calls discussing the incident on December 14, 2026, and December 19, 2026. The story, that this was an accident or unintentional, developed over time after he's talking to others that have viewed the video of the incident.

Lastly, the defense has represented to the United States that the Defendant is likely to testify. If so, the United States will endeavor to cross examine, pursuant to Federal Rules of Evidence 608(b), regarding his working under someone else's social security number since 2010, utilizing a fraudulent Arkansas drivers' license, and failing to file state or federal taxes in the last 10 years.[7] Because deceptive actions weigh in the analysis of credibility, such cross-examination is permissible under Federal Rules of Evidence 608(b).

## III.    THE CHARGED OFFENSE

### a.    Statutory Framework, Purpose, and Elements of 18 U.S.C. § 111.

Section 111(a)(1) of Title 18 provides that whoever "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" any person designated in 18 U.S.C. § 1114 while engaged in or on account of the performance of official duties shall be fined or imprisoned. 18 U.S.C. § 111(a)(1). The Fifth Circuit has interpreted Section 111 as creating three separate offenses: "(1) simple assault[8]; (2) more serious assaults but not involving a dangerous weapon; and (3) assault

---

[6] The defendant did say he was trying to leave at the scene.

[7] Since 2021, he's earned over $240, 000 dollars. However, there's no record of him being registered with the Louisiana Department of Revenue.

[8] "The phrase 'simple assault' is 'a term of art that includes the forcible performance of any of the six proscribed actions in § 111(a) without the intent to cause physical contact or to commit a serious felony' while ''all other cases' covers the commission of these same violations plus the intent to commit a felony or resulting physical contact.'" *United States v. Williams*, 602 F.3d 313, 317 (5th Cir. 2010) (quoting *United States v. Gagnon*, 553 F.3d 1021, 1026 (6th Cir. 2009)).

with a dangerous weapon." *United States v. Ramirez*, 233 F.3d 318, 321 (2000), *overruled on other grounds*, by *United States v. Cotton*, 122 S. Ct. 1781, 1784 (2002). Under subsection (b), where the defendant "uses a deadly or dangerous weapon  (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component)  or inflicts bodily injury, the penalty is up to twenty years of imprisonment." 18 U.S.C. § 111(b); *see also United States v. Hernandez-Hernandez*, 817 F.3d 207, 213 (5th Cir. 2016) ( "The third offense, under § 111(b), is a felony carrying a maximum penalty of up to 20 years in prison, and requires proof of the use of a deadly weapon or the infliction of bodily injury 'in the commission of any of the acts described in subsection (a).'")

As previously referenced, courts recognize a Congressional intent to protect federal officers to the maximum extent possible through 18 U.S.C. § 111(b). *United States v. Arrington*, 309 F.3d 40, 46 (D.C. Cir. 2002) (citing *Feola*, 420 U.S. at 684). The Supreme Court has confirmed that Section 111 serves the purposes of protecting federal officers but "is not simply to protect federal officers by punishing assault, but also to 'deter interference with federal law enforcement activities' and ensure the integrity of federal operations by punishing obstruction and other forms of resistance." *United States v. Williams*, 602 F.3d 313, 317 - 318 (5th Cir. 2010) (quoting *United States v. Feola*, 420 U.S. 671, 678-79 (1975)).

Based on the Fifth Circuit Jury Instructions, below are the elements that the United States must prove for a violation of 18 U.S.C. § 111(a) & (b):

*First*: That the defendant forcibly assaulted [resisted, opposed, impeded, intimidated, or interfered with] a federal officer, as described below;

*Second*: That the federal officer was forcibly assaulted, [resisted, opposed, impeded, intimidated, or interfered with] while engaged in the performance of her official duty or on

8

account of the performance of official duties;

*Third*: That the defendant did such acts intentionally; and

*Fourth*: That in doing such acts, the defendant used a deadly or dangerous weapon or inflicted bodily injury.

The term "forcible assault" means any intentional attempt or threat to inflict injury upon someone else when a defendant has the apparent present ability to do so. This includes any intentional display of force that would cause a reasonable person to expect immediate bodily harm, regardless of whether the victim was injured or the threat or attempt was actually carried out.

The term "deadly or dangerous weapon" means any object capable of inflicting death or bodily injury. [9] For such a weapon to have been "used," the government must prove not only that the defendant possessed the weapon but also that the defendant intentionally displayed it while [he forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with a federal officer.]

*See* 5TH CIR. PATTERN JURY INSTRUCTIONS: CRIMINAL § 2.07 (2024); *see also* PATTERN JURY INSTRUCTIONS: CRIMINAL § 2.07 (2019). The bracketed portions reflect inclusions based on upon all the manner and means listed in 18 U.S.C. § 111(a)(1).[10]

### b. Assaultive Conduct is Not Required for Conviction. Any of the Manner and Means Violate the Statute.

The Fifth Circuit has found that the statue is violated by any of the manner and means alleged in the statute (assault, resist, oppose, impede, intimidate or interfere) not just assault.

---

[9] The definitions of "deadly or dangerous weapon" and "bodily injury" are derived from the United States Sentencing Guidelines. *See* U.S. Sentencing Guidelines Manual § 1B1.1 cmt. n.1 (2023); United States v. Hernandez-Hernandez, 817 F.3d 207, 216–17 (5th Cir. 2016). A "bodily injury" means any significant injury; e.g., an injury that is painful or obvious, or is a type for which medical attention would ordinarily be sought. *Id.*
[10] The United States is also filing proposed jury instructions.

*Williams*, 602 F.3d at 317 - 318.[11]  Therefore, a charge for simple assault under 18 U.S.C. 111(a)(1) does not require any "underlying assaultive conduct" or physical contact between the defendant and a federal agent. *Id.* at 318.   The adverb "forcibly" modifies not just "assaults," but all enumerated six acts rendered unlawful by Section 111(a)(1). *United States v. Hazlewood*, 526 F.3d 862, 865 (5th Cir. 2008). Thus, a defendant violates Section 111 not only when there is forcible assaultive conduct, but also where the defendant *forcibly* resists*, forcibly* opposes, *forcibly* impedes, and so on. *See id.* (citing *Arrington*, 309 F.3d at 44) (emphasis in original). "[R]equiring an underlying assault for a defendant to be convicted would render meaningless the five forms of non-assaultive conduct that are plainly proscribed by the statute." *Williams*, 602 F.3d at 317 (citing *United States v. Gagnon*, 553 F.3d 1021, 1026 (6th Cir. 2009)).

### c.  The Force Requirement.

"Force is a necessary element for any § 111 violation." *Hazlewood*, 526 F.3d 862 (citing *United States v. Schrader*, 10 F.3d 1345, 1348 (8th Cir. 1993)). The "term 'forcibly' modifies all of the acts rendered unlawful by § 111(a)(1)." *Id.* at 865. Thus, "a defendant does not violate § 111(a)(1) unless he *forcibly* assaults or *forcibly* resists or *forcibly* opposes" and so on. *Id.* citing *United States v. Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002) (emphasis in original). A "forcible" act under § 111 does not require physical contact but is found when a defendant "acted toward the federal agent in a forceful manner, for the purpose of resisting, opposing, impeding, intimidating, or interfering with the agent." *Sophin v. United States*, 153 F.Supp. 3d. 956, 964 (W.D. Tex. Sept. 18, 2015).

---

[11] There is a circuit split here. However, the Fourth, Fifth, and Sixth circuits held that assaultive conduct is not required for a conviction under 18 U.S.C. §111(a)(1). *United States v. Williams*, 602 F.3d 313, 317 - 318 (5th Cir. 2010); *United States v. Gagnon*, 553 F.3d 1021, 1026 (6th Cir. 2009); *United States v. Briley*, 770 F.3d 267, 274 (4th Cir. 2014).

However, "the Fifth Circuit has not resolved a key ambiguity in the statute, namely, the meaning of 'forcibly.' *United States v. Contreras*, 800 F.Supp.3d 709, 713 (W.D.TX. Sept. 18, 2025). The Sixth Circuit has determined that the absence of physical contact, "[t]he element of force necessary for a conviction under [§ 111] may be shown by 'such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death.' " *United States v. Rafidi*, 829 F.3d 437, 446 (6th Cir. 2016) (quoting *United States v. Chambers*, 195 F. 3d 274, 277 (6th Cir. 1999)). In *Sophin v. United States*, the Court noted that the Fifth Circuit had not adopted this definition but had upheld convictions that were, at least, consistent with the definition. 153 F.Supp. 3d. at 964; *Williams*, 602 F.3d at 318 (there was "ample evidence" that the defendant forcibly resisted federal officers when "she swung her arms for the specific purpose of resisting officers attempts to handcuff her"); *United States v. Hightower*, 512 F.2d 60, 61 (5th Cir. 1975) (the Fifth Circuit found sufficient evidence where defendant refused to identify himself and grabbed agent's jacket in attempt to retrieve co-defendant's license); *Carter v. United States*, 231 F.2d 232, 235 (5th Cir. 1956) (finding that a defendant who abruptly started car and continued to drive at increasing speed while federal agent struggled to maintain hold on car was properly convicted of forcible interference with a federal officer under section 111).

In *Sophin* and *Contreras*, for purposes of 18 U.S.C. 111, the courts ultimately determined that forcibly should be given its ordinary meaning. *Contreras*, 800 F.Supp.3d at 714; *Sophin*, 153 F.Supp. 3d. at 964. Both courts referenced the Supreme Court's analysis in *Johnson v. United States*, where the Court gave physical force its ordinary meaning in the Armed Career Criminal Act context because it was not defined; and, one noted common definition for force was "strength or energy; active power; vigor; often an unusual degree of strength or energy, power to affect strongly in physical relations, or power, violence, compulsion, or constraint exerted upon a

11

person." *Johnson v. United States*, 559 U.S. 133, 138 - 139 (2010); *Contreras*, 800 F.Supp.3d at 714 (citing *Force*, BLACK'S LAW DICTIONARY (12th ed. 2024)); *Sophin*, 153 F.Supp. 3d. at 964. In *Contreras*, the Court also noted that when the Fifth Circuit found sufficient force was used in *Williams*, that "there was no mention of how the defendant's conduct affected the officers; rather, the obstreperous conduct itself was sufficient forceful resistance to merit a conviction." *Contreras*, 800 F.Supp.3d at 714. Therefore, this element is proven by acting toward the federal agents in a forceful manner.

### d.  Intent

18 U.S.C. § 111(a) is a general intent statue. *United States v. Kimes*, 246 F.3d 800, 802 (6th Cir. 2001); *United States v. Ricketts*, 146 F.3d 492, 497 (7th Cir. 1998); see *United States v. Kleinbart*, 27 F.3d 586, 592 (D.C. Cir. 1994); *United States v. Jim*, 865 F.2d 211, 215 (9th Cir. 1989). The Second Circuit, in *United States v. Melhuish*, has noted that, "[t]he First, Fifth, and Tenth Circuits have issued decisions with language arguably suggesting a specific intent requirement, but none of these decisions directly analyzed whether § 111 is a specific or general intent crime such that a defendant can offer evidence to negate the mens rea element." *United States v. Cross*, NO: 22-184, 2024 WL 758609, at *2 (E.D.L.A Feb. 23, 2024) (quoting *United States v. Melhuish*, 6 F.4th 380, 396 n.7 (2nd Cir. 2021)); (*citing United States v. Taylor*, 680 F.2d 378, 381 (5th Cir. 1982)). In *United States v. Cross*, the Court concluded[12] that the Fifth Circuit had not considered whether 18 U.S.C. § 111(a) whether was a specific or general intent crime, and then concluded from its own analysis that the statue was, in fact, a general intent crime. *United States v. Cross*, NO: 22-184, 2024 WL 758609, at *2, 5 (E.D.L.A Feb. 23, 2024) (noting that the

---

[12] "In considering the Fifth Circuit's opinions in *Burke, Flood*, and *Taylor*, this Court finds that the Fifth Circuit has not yet considered the precise issue of whether § 111 requires that a defendant acted with general or specific intent." *Cross*, NO: 22-184, 2024 WL 758609, at *2 (*Burke v. United States*, 400 F.2d 866 (5th Cir. 1968); *United States v. Flood*, 586 F.2d 391 (5th Cir. 1978); *United States v. Taylor*, 680 F.2d 378 (5th Cir. 1982)).

Second, Fourth, Sixth, Seventh, Eight, Eleventh, and D.C. Circuits have expressly held that 18 U.S.C. § 111 is a general intent crime, and finding "the analyses of the circuit courts…compelling"). To prove general intent, the United States must prove that the "defendant knowingly, consciously, and voluntarily committed an act which the law makes a crime." *Kleinbart*, 27 F.3d at 592.[13]

### e. The United States Need Not Prove that the Defendant Knew that the Victims were Federal Officers.

There is no requirement to prove the defendant had knowledge he was assaulting a law enforcement officer. In *United States v. Alvarado*, the defendant was convicted for aggravated assault on a federal agent in violation of Section 111(a)(1) and (b). 630 Fed.Appx. 271, 272 (5th Cir. 2015). The Fifth Circuit rejected the defendant's argument that the "district court erred when it overruled his objection to the instruction in the jury charge that he need not have known he was assaulting a federal agent." *Id.* at 277-78. "[T]o be convicted of assault on a federal officer, the defendant need not have the specific intent to assault a *federal officer*—rather, the intent to assault is sufficient." *Id.* at 278 (emphasis in original). A defendant's "knowledge of his victim's identity is not an element of the offense." *Id.*

### f. Vehicles Can Be Used as Dangerous or Deadly Weapons.

"[F]or a car to qualify as a dangerous weapon, the defendant must use it as a deadly weapon and not simply as a mode of transportation." *Arrington*, 309 F.3d at 45. The Fifth Circuit has upheld convictions under Section 111 where defendants have used vehicles to direct force against law enforcement officers as dangerous or deadly weapons. For example, in *United States v. Morris*,

---

[13] Furthermore, the intent to commit bodily injury can be inferred, and a vehicle can be a dangerous weapon when used to strike another vehicle. *United States v. Hernandez-Conde*, 301 Fed.Appx. 372, 374 (5th Cir. 2008).

the Court affirmed the defendant's sentence where he rammed his vehicle into a federal agent's vehicle while the federal agent was inside. 131 F.3d 1136 (5th Cir. 1997).

Additionally, in *Hernandez-Conde*, the Court found that the defendant used his car as a dangerous weapon, triggering a sentence enhancement pursuant to USSG section 2D1.1(b)(1), when he backed his car into, and intentionally struck, an officer's vehicle after that officer parked behind him in order to apprehend him. *United States v. Hernandez-Conde*, 301 F. App'x 372, 373 (5th Cir. 2008).[14] Although the officers vehicle received minimal damage and although the officer was not injured, the Court found the defendant's "action in unnecessarily striking the vehicle created a substantial risk of bodily harm." *United States v. Hernandez-Conde*, 301 F. App'x 372, 373-374 (5th Cir. 2008).

### g. There is No Requirement to Prove the Defendant Inflicted Injury by Using a Deadly or Dangerous Weapon for the Subsection (b) Enhancement to Apply.

For purposes of 18 U.S.C. § 111(b), the United States is not required to prove the defendant inflicted an injury by using a deadly or dangerous weapon. In *Hernandez-Conde*, the defendant backed his car into and intentionally struck an officer's vehicle as the officer parked his car behind the defendant. 301 F.App'x. at 373 (5th Cir. 2008). The defendant's actions only caused minimal damage to the officer's vehicle, and the officer was not injured. *Id.* The Court rejected the defendant's contention that the (b)(1) sentencing enhancement was inapplicable because he did not use it with the intent to commit a bodily injury. *Id.* Rather, the Court stated the "intent to commit bodily injury can be inferred, and a vehicle can be a dangerous weapon when used to strike another vehicle." *Id.* at 374 citing *United States v. Morris*, 131 F.3d 1136, 1137-39 (5th Cir. 1997); *United States v. Perez*, 897 F.2d 751, 753 (5th Cir. 1990). The Court further noted that it has

---

[14] Afterwards, the defendant fled recklessly and continued to place officers in danger. *Hernandez-Conde*, 301 F. App'x at 373.

"upheld the application of an enhancement for assaulting an official even where the defendant narrowly missed striking a patrol car." *Id.* (citing *United States v. Gillyard*, 261 F.3d 506, 510 (5th Cir. 2001)).

## IV.    THE EVIDENCE WILL DEMONSTRATE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT VIOLATED 18 U.S.C. § 111 (a) & (B)

Border Patrol Agent-1 and Agent-2 are federal officers, and clearly, they were in the performance of their duties when Agent-1 attempted to detain the Defendant for being in the United States illegally. Clearly, the Defendant used force when he crashed the Ford Mustang, which is over 3,000 pounds, into the large white Jeep Wagoneer. The impact of the collision can be heard on the body camera footage. On the surveillance footage, after the collision the front drivers' wheel of the large white Jeep Wagoneer is knocked to an angle, and the vehicle, which is over 6000 pounds, shakes. Afterwards, the large white Jeep Wagoneer is misaligned and its steering is impaired, and the vehicle had to be repaired. Also, the vehicle was used as a deadly or dangerous weapon, because at the moment of impact, Agent-1's shadow is on the trunk of the Ford Mustang. If the agent had moved a little faster, and was a step or two closer, he would've been hit. Then at the scene, during his statements, and on jail calls, the defendant has repeated his desire to flee. At the very least, that stated desire to flee is an admission of impeding, interfering with, and opposing law enforcement.

The defense, essentially, challenges the intent element by asserting "this case was a parking lot accident and not a crime." Rec. Doc. 34. Contrary to the Defendant's contention, the evidence at trial will prove beyond a reasonable doubt that the Defendant intentionally and forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with federal officers while they were engaged in the performance of their official duties. Numerous facts demonstrate the Defendant's knowledge and intent.

When the defendant entered the parking lot, he drove around the large white Jeep Wagoneer and an ICE agent noticed the defendant looking around. Approximately 10 seconds pass from when the defendant parked the Ford Mustang and the crash, ample time to make a lawful decision. Instead, the defendant made several bad decisions, that amount to a crime. The defendant decided to put the Ford Mustang in reverse. The Defendant decided to turn the wheel of the Ford Mustang. And then, the Defendant decided to hit the accelerator. The turning of the wheel demonstrates the defendant was aware of the large white Jeep Wagoneer behind him.

At the scene, the defendant is composed without signs of panic. Shortly after the collision, the Defendant, after being advised of his *Miranda* rights, gave a statement to the FBI. During that statement, he admitted to fleeing because knew law enforcement was trying to catch him for being in the country illegally[15] and laughed about fleeing.

Furthermore, the Defendant's nonverbal communications during the interview demonstrate that he was aware law enforcement officers were behind the Ford Mustang. After he said that he stopped the vehicle, the Defendant raised his right hand and pointed upwards as if he was pointing into a rearview mirror and said, "I see them."

The Defendant further said, "they tried to close my way" and made an encircling motion with both arms. The Defendant then stated, "they closed my way" and "so I get in reverse," and again made a turning motion with both hands. So then, the defendant hit the accelerator even though the collision was inevitable and unavoidable.

During that FBI interview, the Defendant never states or suggests that his conduct was accidental or unintentional. At the end of the interview, the FBI Agent asked if there was anything

---

[15] The defendant's illegal status is intrinsic to the offense. *United States v. Yi*, 460 F.3d 623, 632 -633 (5th Cir. 2006).

16

else the Defendant wanted to add or say. Again, he never states that his conduct was accidental or unintentional. But during the interview, he did state, "maybe its my mistake."

Also, the defendant did not say it was an accident or unintentional at the scene or on the jail calls on December 14th or December 19th, when he discussed the crash. The defendant knew he was directing force at the officers, and that his conduct was intentional.

## V.    CROSS EXAMINATION

Under Federal Rules of Evidence 608 (b), a court may allow a party to inquire into specific instances of a witness's conduct if it is probative of their character for truthfulness. Unlike Federal Rules of Evidence 404(b), 608 (b) has no notice requirement. *United States v. Tomblin*, 46 F.3d 1369 (5th Cir. 1995). "The district court has substantial discretion in determining whether the probative value of the testimony substantially outweighs the danger of unfair prejudice." *United States v. Oti*, 872 F.3d 678, 694 (5th Cir. 2017) (*citing United States v. Farias-Farias*, 925 F.2d 805, 809 & 811 n.11 (5th Cir. 1991)).

Questions about past specific instances of misconduct pertaining to fraud are admissible under Federal Rule of Evidence 608(b) because they are "clearly probative of truthfulness or untruthfulness." *Id.* at 693 - 694. (citing *United States v. Tomblin*, 46 F.3d 1369, 1389 (5th Cir. 1995). The false use of social security numbers is relevant to credibility and admissible under 608(b). *See United States v. Weeke*s, 611 F.3d 68, 71 (1st Cir. 2010). Additionally, the failure to file tax returns is probative to character for truthfulness. *United States v. Bustamante*, 45 F.3d 933, 945 (5th Cir. 1995); *see also Chnapkova v. Koh*, 985 F.2d 79, 82 (2d Cir.1993) ("The total failure to file tax returns for a period of eight years should be similarly admissible on the issue of ... truthfulness, subject to the discretionary considerations in Rules 403 and 608(b)."), *abrogated on other grounds, Jaffee v. Redmond, 518 U.S. 1  (1996).* Therefore, if the defendant elects to testify

then he makes his character for truthfulness relevant under Federal Rules of Evidence 608(b), and he may be cross-examined on matters relating to his credibility such as working under someone else' social security number, utilizing a fraudulent Arkansas drivers' license, and whether he has filed tax returns.

## VI.    CONCLUSION

The United States respectfully submits this trial brief in regard to the legal issues and evidentiary matters set forth above.

UNITED STATES OF AMERICA, by

KURT L. WALL
UNITED STATES ATTORNEY

/s/ Jeremy S. Johnson
Jeremy S. Johnson, TXBN 24094755
Assistant United States Attorney
451 Florida Street, Suite 300
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0561
E-mail: jeremy.johnson@usdoj.gov


/s/ Allen L. Ross
Allen L. Ross, LBN 36654
Special Assistant United States Attorney
451 Florida Street, Suite 300
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0561
E-mail: allen.ross@usdoj.gov