**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| *versus* | : | CRIMINAL NO. 25-181-JWD-EWD |
| | : | |
| EVODIO MERIDA-TAVERA | : | |

**UNITED STATES' POST-TRIAL BRIEF**

## I.     INTRODUCTION

The evidence proves beyond a reasonable doubt that the Defendant intended to forcibly assault, resist, oppose, impede, intimidate, or interfere with federal officers while they were engaged in the performance of their duties, and used a deadly or dangerous weapon to do so. This brief addresses all the elements that the United States needs to prove for violations of 18 U.S.C. § 111(a) & (b), and why the government has done so. However, the United States will primarily focus on why it has proven that the Defendant's conduct was intentional because that is the element the defense has primarily challenged. *See* Rec. Doc. 36.

With that said, in this case, the Defendant did in fact act intentionally, because he knew the large white Jeep Wagoneer was behind him, knew that he would hit the Wagoneer with the Mustang, and still decided to press the accelerator anyway in a hopeless escape attempt.[1] Below are reasons why the evidence proves beyond a reasonable doubt that the Defendant acted intentionally:

1. Due to the size and positioning of the large white Jeep Wagoneer, it is reasonable to infer that the Defendant did in fact see it before he decided to press the accelerator, and reverse the Mustang into the large white Jeep Wagoneer. That Wagoneer was over 6 feet tall and

---

[1] A record of the bench trial is not yet complete so when testimony is mentioned, it is as the United States' recalls it.

over 17 feet long.  The hood of the large white Jeep Wagoneer exceeded 4.2 feet above the ground while the rear of the Mustang was only 3.4 feet above the ground. *See* U.S. Exhibit 20 at pg. 17. The Wagoneer covered the rear end of the Ford Mustang but for two inches. *See* U.S. Exhibit 16h. Also, there were no obstructions to the Ford Mustang that would prevent a driver from observing the Jeep Wagoneer. *See* U.S. Exhibit 20 at pg. 17. And the testimony generally described the Defendant as calm post-collision. Expert Adam Hyde testified that the Jeep Wagoneer was parked behind the Ford Mustang for 5.5 seconds, before the Defendant reversed. Simply, the large white Jeep Wagoneer was blatantly available for the Defendant to see, and it is reasonable to infer that the Defendant did see it.

2.  The Defendant had good reason to be on the lookout for immigration authorities. Agent Guillen testified that their immigration enforcement activities had been in the news. The Defendant's statement to the FBI indicated that he knew that immigration authorities were apprehending people. *See* U.S. Exhibit 1-a-3, at 2:28 to 2:32 ("the guys catch people"). And the Defendant was in the country illegally. So, he had good reason to be on the lookout for immigration enforcement, and anything out of the ordinary such as a large white Jeep Wagoneer. Furthermore, he was observed by Agent Gloyd to be looking around, as the Defendant drove past the large white Jeep Wagoneer.[2]  It is only reasonable to infer that he would continue to direct his attention to the large White Jeep Wagoneer.

3.  In his statement to the FBI, the Defendant twice said, "they closed my way," and shortly thereafter said, "I tried to run away." *See* U.S. Exhibit 1, at page 7; U.S. Exhibit 1-a-3 at :49 - :55; *See* U.S. Exhibit 1, at page 7; U.S. Exhibit 1-a-3 at 2:07 – 2:38. This is direct evidence

---

[2] The front of the Jeep Wagoneer had untinted windows, so when the Defendant drove by Agent Guillen, this would have been an opportune time to see him in his vest. *See* U.S. Exhibit 11a.

that the Defendant knew the large white Jeep Wagoneer was behind him when he decided to press the accelerator.

4. During the Defendant's statement to the FBI, Special Agent Anderson specifically, asked for the first thing that happened. The Defendant replied, "the first thing that happen, okay. I stopped. When I stopped I see them." *See* U.S. Exhibit 1, at page 7; U.S. Exhibit 1-a-3 at 2:07 – 2:38. At that point the Defendant raises his right hand to where the rearview mirror would be, and Special Agent Anderson testified that he observed him looking up. Again, this is direct evidence that the Defendant saw in his rearview mirror that the large white Jeep Wagoneer was behind him.

5. During the Defendant's FBI interview, he never once said that he did not see the Jeep Wagoneer. In the Defendant's statement to the FBI, he explained that he had first come to the United States in 2007, had stayed until 2010, and then came back in 2011 and has stayed until the present. *See* U.S. Exhibit 1-a-2 at 3:15 – 3:30; *See* U.S. Exhibit 1, at page 4. That is 17 - 18 years that the Defendant has spent in the United States; over 6000 days immersed in U.S. culture. The simple question, 'Where was I in 2007?' puts the scale of this amount of time in perspective. So, if the Defendant truly did not see the large white Jeep Wagoneer behind him, it makes no sense that he would omit that significant detail, especially give how long he's been in the U.S. It defies common sense.

6. When the Defendant reversed, he decided to turn the steering wheel. *See* U.S. Exhibit 20, at page 21. This indicates awareness of the Wagoneer behind him. The large white Jeep Wagoneer covered the rear of the Mustang but for 2 inches. *See* U.S. Exhibit 16h. By turning the wheel, the Defendant avoids hitting the Wagoneer with all of the rear of the Mustang. However, half of the rear of the Mustang still hits the large white Jeep Wagoneer. *See* U.S. Exhibit 20, at

pg. 21 ("Impact occurred on the right rear corner of the Ford, from approximately the center, near the license plate, to its ride side."); U.S. Exhibit 18_000094 (Moment of impact). The fact that half the rear of the Mustang hit the Wagoneer makes it clear that the Defendant knew he would hit the Wagoneer and the escape attempt was hopeless, especially in light of expert Adam Hyde testifying that the Defendant wasn't going to be able to get out and Agent Guillen testifying on cross examination that there was no way the Defendant believed he could get out of there. Agent Guillen was on the scene, and his perspective should be given great weight. Also, the evidence does not suggest that the Defendant was just turning around to go back out the way he came in, is because that entrance to the parking lot is narrow. *See* U.S. Exhibit 9b (narrowness). And, there was another way out of the parking lot. *See* U.S. Exhibit 6a; U.S. Exhibit 6b (see bottom left screen).

7. Three days after the crash, on a jail call on December 14, 2025, the Defendant indicated that he did not know that the Wagoneer was a law enforcement vehicle. This suggest that he did see the Wagoneer but just didn't realize it was law enforcement. *See* U.S. Exhibit 12a, page 17. Not knowing it was law enforcement would not be a defense. However, it was not until 10 days after the crash, on a jail call on December 21, 2025, that the Defendant indicated for the first time that he did not see the large white Jeep Wagoneer behind him; and, that was during a conversation with someone that had reviewed the video and who suggested to the Defendant that he had not seen the Wagoneer behind him, and it was during a conversation where they discussed how the Defendant could have evaded immigration authorities. *See* U.S. Exhibit 14a, at pg. 19 – 20.

## II.    **<u>SUMMARY OF THE TRIAL</u>**

The bench trial commenced on the morning of June 23, 2026. There were joint stipulations entered into the record. Each party provided opening statements. After opening statements, the United States called seven (7) witnesses to testify in its case in chief. Those witnesses were two Border Patrol Agents (Guillen and Gamez), two ICE agents (Maxwell and Gloyd), an FBI Special Agent (Anderson), an FBI linguist, and Crash Reconstruction Expert Adam Hyde. Agents Guillen and Gamez were utilizing the large white Jeep Wagoneer, while Maxwell and Gloyd were assisting them and utilizing a black Dodge Ram pickup truck. The exhibits entered into the record included (but not limited to): body camera footage with translations, surveillance footage, video of the Defendant's recorded statement, photographs, jail calls with accompanying translations, repair documents, an expert report, and diagrams. On June 24, 2026, the United States rested its case.

## III.    **<u>ELEMENTS OF OFFENSE</u>**

Based on the Fifth Circuit Jury Instructions, below are the elements that the United States must prove for a violation of 18 U.S.C. § 111(a) & (b):[3]

*First*: That the defendant forcibly assaulted [resisted, opposed, impeded, intimidated, or interfered with] a federal officer, as described below;

*Second*: That the federal officer was forcibly assaulted, [resisted, opposed, impeded, intimidated, or interfered with] while engaged in the performance of her official duty or on account of the performance of official duties;

*Third*: That the defendant did such acts intentionally; and

---

[3] *See* 5TH CIR. PATTERN JURY INSTRUCTIONS: CRIMINAL § 2.07 (2024); *see also* PATTERN JURY INSTRUCTIONS: CRIMINAL § 2.07 (2019). The bracketed portions reflect inclusions based on upon all the manner and means listed in 18 U.S.C. § 111(a)(1).

*Fourth*: That in doing such acts, the defendant used a deadly or dangerous weapon or inflicted bodily injury.

The term "forcible assault" means any intentional attempt or threat to inflict injury upon someone else when a defendant has the apparent present ability to do so. This includes any intentional display of force that would cause a reasonable person to expect immediate bodily harm, regardless of whether the victim was injured or the threat or attempt was actually carried out.

The term "deadly or dangerous weapon" means any object capable of inflicting death or bodily injury.[4] For such a weapon to have been "used," the government must prove not only that the defendant possessed the weapon but also that the defendant intentionally displayed it while [he forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with a federal officer.]

It is not necessary to prove the defendant knew the person being forcibly assaulted was, at that time, a federal officer carrying out an official duty, so long as it is established beyond a reasonable doubt that the person assaulted was, in fact, a federal officer acting in the course of his [her] duty and that the defendant intentionally committed a forcible assault upon that officer.

*Forcibly Assault, Resist, Oppose, Impede, Intimidate or Interfere*

The Fifth Circuit has found that the statue is violated by any of the manner and means alleged in the statute (assault, resist, oppose, impede, intimidate *or* interfere) not just assault. *United States v. Williams*, 602 F.3d 313, 317-18 (5th Cir. 2010).

"Force is a necessary element for any § 111 violation." *United States v. Hazlewood*, 526 F.3d 862, 865 (5th Cir. 2008) (citations omitted). The "term 'forcibly' modifies all of the acts rendered unlawful by § 111(a)(1)." *Id.* at 865. Thus, "a defendant does not violate § 111(a)(1)

---

[4] The definitions of "deadly or dangerous weapon" and "bodily injury" are derived from the United States Sentencing Guidelines. *See* U.S. Sentencing Guidelines Manual § 1B1.1 cmt. n.1 (2023); *United States v. Hernandez-Hernandez*, 817 F.3d 207, 216–17 (5th Cir. 2016). A "bodily injury" means any significant injury; e.g., an injury that is painful or obvious, or is a type for which medical attention would ordinarily be sought. *Id.*

unless he forcibly assaults or forcibly resists or forcibly opposes" and so on. *Id.* However, "the Fifth Circuit has not resolved a key ambiguity in the statute, namely, the meaning of 'forcibly.' *United States v. Contreras*, 800 F.Supp.3d 709, 713 (W.D.TX. Sept. 18, 2025).

The Sixth Circuit has determined that the absence of physical contact, "[t]he element of force necessary for a conviction under [§ 111] may be shown by 'such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death.'" *United States v. Rafidi*, 829 F.3d 437, 446 (6th Cir. 2016) (quoting *United States v. Chambers*, 195 F. 3d 274, 277 (6th Cir. 1999)). In *Sophin v. United States*, the Court noted that the Fifth Circuit had not adopted this definition but had upheld convictions that were, at least, consistent with the definition. *Sophin v. United States*, 153 F.Supp.3d 956, 964 (W.D. Tex. 2015).

In *Sophin* and *Contreras*, for purposes of 18 U.S.C. 111, the courts ultimately determined that forcibly should be given its ordinary meaning. *Contreras*, 800 F.Supp.3d at 714; *Sophin v. United States*, 153 F.Supp.3d 956, 964 (W.D. Tex. 2015). Both courts referenced the Supreme Court's analysis in *Johnson v. United States*, where the Court gave physical force its ordinary meaning in the Armed Career Criminal Act context because it was not defined; and, one noted common definition for force was "strength or energy; active power; vigor; often an unusual degree of strength or energy, power to affect strongly in physical relations, or power, violence, compulsion, or constraint exerted upon a person." *Johnson v. United States*, 559 U.S. 133, 138 - 139 (2010); *Contreras*, 800 F.Supp.3d at 714 (citing *Force*, BLACK'S LAW DICTIONARY (12th ed. 2024)); *Sophin*, 153 F.Supp. 3d. at 964.

In this case, while knowing the Jeep Wagoneer was behind his Ford Mustang, the Defendant knowingly reversed his vehicle, accelerated at a higher-than-normal rate, and rammed his vehicle into the Jeep Wagoneer. In *Carter v. United States*, the Court upheld the defendant's

7

conviction where he abruptly sped away at a high rate of speed in his vehicle while an officer attempted to conduct an arrest and maintain his hold. 231 F.2d 232 (5th Cir. 1956.) The Court held the defendant's conduct was "manifestly a forcible interference." *Id.* at 235. In *Hernandez-Conde*, the defendant backed his car into and intentionally struck an officer's vehicle as the officer parked his car behind the defendant. 301 F.App'x. at 373 (5th Cir. 2008). [5] The defendant's actions only caused minimal damage to the officer's vehicle, and the officer was not injured. *Id.* The Court rejected the defendant's contention that the (b)(1) sentencing enhancement was inapplicable because he did not use it with the intent to commit a bodily injury. *Id.* Rather, the Court stated the "intent to commit bodily injury can be inferred, and a vehicle can be a dangerous weapon when used to strike another vehicle." *Id.* at 374 citing *United States v. Morris*, 131 F.3d 1136, 1137-39 (5th Cir. 1997); *United States v. Perez*, 897 F.2d 751, 753 (5th Cir. 1990). The Court further noted that it has "upheld the application of an enhancement for assaulting an official even where the defendant narrowly missed striking a patrol car." *Id.* (citing *United States v. Gillyard*, 261 F.3d 506, 510 (5th Cir. 2001)).

In *Sophin v. United States*, the Cout held the defendant did not act forcibly toward the Border Patrol Agent where, "essentially, he pulled away" by driving away from a security checkpoint after refusing to answer questions. 153 F.Supp.3d 956 (W.D. Tex. 2015). In *Sophin*, the Court noted that the defendant did not attempt to run over an officer, rev the vehicle's engine, and nor did the agent need to jump out of the way. *Id.* at 960. However, distinguishable from *Sophin*, the Defendant here attempted to do more than just simply "leave" the scene; rather, as confirmed by the expert witness, he accelerated his vehicle at a higher than average rate of speed, revved his engine two times, and physically rammed his vehicle into the Jeep Wagoneer,

---

[5] Afterwards, the Defendant fled recklessly and continued to place officers in danger. *Hernandez-Conde*, 301 F. App'x at 373.

narrowly missing Border Patrol Agent Guillen by just a few feet. The Defendant attempted to do much more than simply "leave" or escape.

In his attempt to leave, the Defendant forcibly acted against officers by reversing and ramming his vehicle into the Jeep Wagoneer with Agent Guillen in the immediate proximity and with Agent Gamez inside the vehicle. Both Agents Guillen and Gamez testified that the Defendant's actions caused them fear. Thus, the evidence demonstrates the Defendant forcibly acted by showing "threats or displays of physical aggression . . . to inspire fear of pain, bodily harm, or death." *Id.* at 966.

Flight with force directed toward the federal agents, as was the case here, constitutes forcibly assaulting, resisting, opposing, impeding, intimidating or interfering with those federal agents.

### *Performance of Duties*

Under 18 U.S.C. § 111, a federal officer must be "engaged in or on account of the performance of official duties." The test of a Government agent's conduct is whether he is acting "within the scope of what [he] is employed to do," as distinguished from "engaging in a personal frolic of his own." *United States v. Lopez*, 710 F.2d 1071, 1074 (5th Cir. 1983) (citations omitted). Generally, a federal officer is "engaged in performing [the] function" in which employed, in good faith and colorable performance of [his] duty." *Id.*

The evidence in this case established that a Border Patrol Agent is a federal officer, and it is a part of the official duty of such officer to investigate immigration violations, detain, and/or arrest individuals suspected of immigration violations, such as entering the United States illegally or being unlawfully present in the United States. More specifically, in this case, Border Patrol Agents Guillen and Gamez, with support and assistance of ICE Officers Gloyd and

9

Maxwell, testified they acted in the performance of their official duties to make immigration arrests during operation Catahoula Crunch in December 2025. Border Patrol Agent Gamez rented an oversize SUV (Jeep Wagoneer), in his official capacity as an officer of the U.S. Department of Homeland Security and testified he used that vehicle to assist with the goal of effectuating immigration arrests in Louisiana. *See* U.S. Exhibit 22, pages 2, 4, 6. Specifically, the Border Patrol Agents used the Jeep Wagoneer to temporarily detain and process another illegal alien, Hernandez, as well as block the Defendant's vehicle during an arrest attempt after receiving information from Hernandez that the Defendant was in the country illegally. The Defendant crashed into the large white Jeep Wagoneer, when the agents were attempting to apprehend him for being in the country illegally.

Accordingly, because the Border Patrol Agents acted within the scope of what they were employed to do, they were engaged in or on account of the performance of their official duties.

Also, during the trial, Border Patrol Agents Guillen and Gamez, and ICE Officers Gloyd and Maxwell provided context to their operations. They were all experienced agents. With Guillen being with Border Patrol since 2022, Gamez being with Border Patrol since 2008, Gloyd starting with Border Patrol in 2017 and then being with ICE since 2020, and Maxwell being with ICE since 2010. As well, Officers Gamez, Gloyd, and Maxwell have law enforcement supervisory experience.

All agents testified about the dangers they face in the scope of their official job duties. For example, Officer Maxwell testified that assaults and threats against officers' lives had increased exponentially. Officer Maxwell further explained that some ICE facilities have been subject to threats from active shooters. Further, Agent Gamez explained that immigration officers would not wear uniforms in hotel lobbies and would change clothes in their vehicle to

10

avoid detection from hostile members of the public. During this operation, Agent Gamez further testified that he had to rent a different vehicle because his first vehicle had been identified by members of the public tracking his movements. Against this challenging backdrop, these immigration officers were in Louisiana and had to take a number of precautions to safely perform their official duties.

*Intent*

18 U.S.C. § 111 is a general intent statue.[6] Meaning, to prove general intent, the United States must prove that the "defendant knowingly, consciously, and voluntarily committed an act which the law makes a crime." *United States v. Kleinbart*, 27 F.3d 586, 592 (D.C. Cir. 1994). The United States does not have to prove that the Defendant specifically intended to forcibly assault, resist, oppose, impede, intimidate, or interfere with a federal officer, or that those acts were the Defendant's primary purpose. More simply put, the government must prove the Defendant knew what he was doing, chose to do it anyway, and that what he did was a crime.

In this case, the Defendant knew the large white Jeep Wagoneer was behind him, knew he would hit the large white Jeep Wagoneer, and chose to hit the accelerator anyway because he wanted to flee. Those facts are proven beyond a reasonable doubt by the size and positioning of the large white Jeep Wagoneer, the facts and testimony relating to the circumstances of the crash, and, also, the Defendant's statements at the FBI office on December 11, 2025.

It is uncontroverted that Agent Guillen parked the large white Jeep Wagoneer behind the Defendant's Ford Mustang. It is depicted in both the body camera and surveillance footage. *See* U.S. Exhibits 4 and 5.

---

[6] *United States v. Kimes*, 246 F.3d 800, 802 (6th Cir. 2001); *United States v. Ricketts*, 146 F.3d 492, 497 (7th Cir. 1998); see *United States v. Kleinbart*, 27 F.3d 586, 592 (D.C. Cir. 1994); *United States v. Jim*, 865 F.2d 211, 215 (9th Cir. 1989); *United States v. Cross*, NO: 22-184, 2024 WL 758609, at *2, 5 (E.D.L.A Feb. 23, 2024).

That Jeep Wagoneer was 17.92 feet long, 7 feet wide, and weighed 6, 260 pounds. See U.S. Exhibit 20, at page 10. Additionally, the large white Jeep Wagoneer would be slightly over 6 feet tall based on the testimony of Agent Guillen. See U.S. Exhibit 8 (Picture depicting roof of Jeep Wagoneer as slightly taller than Agent Guillen). Adam Hyde testified that the large white Jeep Wagoneer covered the rear end of the Ford Mustang but for two inches, and was located 5.7 feet to 6 feet from the rear of the Mustang. See U.S. Exhibit 16h and 16i.

The hood of the large white Jeep Wagoneer exceeded 4.2 feet above the ground, and the rear of the Mustang was 3.4 feet above the ground. See U.S. Exhibit 20 at pg. 17. Also, no physical obstructions to the Ford Mustang that would prevent a driver from observing the Jeep Wagoneer behind it were noted. See U.S. Exhibit 20 at pg. 17.[7] Altogether, Adam Hyde testified that the large white Jeep Wagoneer was parked behind the Mustang for 5.5 seconds before the Mustang began to reverse.[8] Accordingly, based on Hyde's report and testimony, the large white Jeep Wagoneer was blatantly available to be seen by the Defendant.

Also, the testimony by the Agents generally described the Defendant's demeanor as calm, and so the evidence does not support his perception being subjectively impaired by panic. In fact, when the Agents first make contact with the Defendant, he tells the agents to "calm down." *See* U.S. Exhibit 4a, at page 1.

Nonetheless, the defense argues that the Defendant was merely negligent and never saw the large white Jeep Wagoneer. However, meeting the negligence legal standard is not inconsistent with also meeting the general intent legal standard. Based on the size of the large

---

[7] During the cross examination the expert was asked about the sun. However, the windows of the Mustang were tinted. *See* U.S. Exhibit 10d.

[8] Necessarily, the overall time from when the Jeep Wagoneer parked behind the Mustang to the moment of impact would be longer, and the time Mustang simply parked in the parking stall to the moment of impact would be longer than that. For reference, if the Court looks at US Exhibit 5, the Ford Mustang is already in the park stall when the Jeep Wagoneer first begins to move forward to park behind it. On the body camera footage, U.S. Exhibit 4, the large white Jeep Wagoneer begins to move forward at approximately 2:01 and the impact is at approximately 2:12.

white Jeep Wagoneer and the fact that the Defendant had the opportunity to view it, it would be reasonable to infer that the Defendant did in fact see the Jeep Wagoneer when he hit the accelerator to reverse.[9] In fact, Agents Guillen and Maxwel, based on their testimony, immediately believed the crash was an assault of a federal officer.[10] *See* also U.S. Exhibit 4a (Maxwell stated, "We need to take pictures in case they want to A-F-O this."). Their testimony is compelling given that they perceived the event as it occurred.

Furthermore, Agent Guillen testified that their immigration enforcement efforts had been in the news. And, during his interview at the FBI office, the Defendant referred to the ICE and Border Patrol Agents as, "the guys catch people." See U.S. Exhibit 1-a-3, at 2:28 to 2:32. Therefore, it would be a reasonable inference that the Defendant would be on the lookout for immigration authorities since he is in the U.S. illegally. Also, it was credible when Agent Gloyd noticed the Defendant looking around,[11] when he drove past the large white Jeep Wagoneer, because the Defendant had reason to be looking around. And, it would be reasonable to infer that the Defendant would continue to pay attention to anything out of the ordinary, like a large white Jeep Wagoneer.

Now, the Defendant's own statement to FBI directly proves his intent, and also corroborates the inference that he saw the large white Jeep Wagoneer. Twice in the interview he says, "they closed my way," and makes an encircling motion with his hands. Also, twice following the statement "they closed my way," the Defendant says, "I tried to run away." *See* U.S. Exhibit 1, at page 7; U.S. Exhibit 1-a-3 at :49 - :55; *See* U.S. Exhibit 1, at page 7; U.S.

---

[9] *See* 5TH CIR. PATTERN JURY INSTRUCTIONS: CRIMINAL § 2.07 (2024) (Evidence-Inferences-Direct and Circumstantial).

[10] *See* Agent Guillen's testimony when he discusses why he pulled his firearm, and Maxwell discussing the need to move quickly.

[11] When the Defendant drove around the large White Jeep Wagoneer, the windows were not tinted and Agent Guillen had his vest on.

Exhibit 1-a-3 at 2:07 – 2:38. This is evidence that the Defendant knew that the large white Jeep Wagoneer blocked him in and that he chose to hit that SUV when he pressed the accelerator, because he wanted to flee.

Each time the Defendant says, "they closed my way," there's a clear chronology. For example, the first time he said, "…I stopped where I try to get out. *(\*Defendant motions with his right hand\*)* After that, they closed my way. *(\*Defendant makes encircling motion with both hands\*)* So, I tried to run away." *See* U.S. Exhibit 1, at page 7; U.S. Exhibit 1-a-3 at  :49 - :55.

The second time, before the Defendant answered, the FBI Special Agent asked, "Was the first thing that happen?" This was a question that sought a chronology. Again, the defendant mentions being closed in before trying to runaway. This was the Defendant's response,

> The first thing that happen, okay. I stopped. *(\*Defendant points to the side with right hand\*)* When I stopped I see them. *(\*Defendant raises right hand and points toward rearview mirror\*)* Because, it was like maybe four cops, maybe like four different cops. And so, they tried to close my way. *(\*Defendant makes encircling motion with both arms\*)* They closed my way. So, when I see them I say these the guys catch people. So, I get in reverse. *(\*Defendant makes turning motion with both hands\*).* I tried to run away, but. *See* U.S. Exhibit 1, at page 7; U.S. Exhibit 1-a-3 at 2:07 – 2:38.

Also, when the Defendant said, "I see them" the Defendant points to where the rearview mirror would be. Special Agent Anderson noticed precisely this, and also testified that the defendant appeared to be looking up. In the rearview mirror, the Defendant would have seen the large white Jeep Wagoneer.

However, the defense argues that there was a language barrier between the FBI agents and the defendant, and that the Defendant was merely recounting details in a disordered way and not as he saw them. But the Defendant's responses during the interview were sensible and context appropriate, which demonstrates comprehension. Also, Special Agent Anderson's

testimony demonstrated confidence that the Defendant understood him, with him also referencing small talk with the Defendant throughout the day.

Nonetheless, it seems unlikely that the Defendant meant that he saw all four cops contemporaneously before the crash, since Agent Gamez was in the back of the Jeep Wagoneer, where the windows were tinted; also, there was a car that was between the Defendant and the Dodge Ram where Maxwell was the driver and Gloyd was the passenger. However, the fact that the Defendant twice said his way was closed then that he tried to run away is important, because it demonstrates he was intentional about that detail.

Also, during the interview, the Defendant mentions first coming to the United States in 2007, staying until 2010 and then coming back in 2011 and then staying again until present; in total, at the time of the crash he had been in the U.S. for 17-18 years. That's over 6,000 days immersed in U.S. culture.[12] And, a question such as, "where was I in 2007?" really resonates to put this amount of time in perspective. Toward the end of the interview, FBI Special Agent Anderson asked the Defendant, "…If there was anything else important about what happened today that you want us to know?" In response, he said, "Umm, no that's all," and again said, "they catch me for like no reason." If the Defendant truly did not see the Jeep Wagoneer, it defies common sense that he would omit that important detail from his statement to the FBI, after being in the U.S. for 17 years.

Furthermore, knowing he was closed in and choosing to flee anyway is consistent with the aforementioned physical evidence. That is, that the large white Jeep Wagoneer was

---

[12] Also, the Defendant mentions having insurance and paying tickets. The tickets suggests at least some familiarity (if even small) with law enforcement, and the United States had given the defense 404(b) notice of utilizing the tickets for that purpose. However, it seems the defense may have mistook that for a 608(b) purpose. *See* Rec. Doc. 42. Also, bank cards bearing the Defendant's name are in evidence. *See* US. Exhibit 19.

positioned behind the Mustang and blatantly available to be seen, and the Defendant had been observed looking around by Gloyd and that the Defendant had reason to be looking around.

When the Defendant reversed the Mustang, he turned the steering wheel. *See* U.S. Exhibit 20, at pg. 21. And, he backed out at an angle, rotating the Mustang clockwise to the right. *See* U.S. Exhibit 20, at pg. 21; *See* U.S. Exhibit 16f. Then about half of the rear end of the Mustang impacted the front end of the large white Jeep Wagoneer. *See* U.S. Exhibit 20, at pg. 21 ("Impact occurred on the right rear corner of the Ford, from approximately the center, near the license plate, to its ride side."). See below:



U.S. Exhibit 18_000094 (Moment of impact)

The United States recalls Expert Adam Hyde testified that the defendant would not have been able to get out, and that Agent Guillen testified on cross examination that there was no way he (the Defendant) could have believed he could have gotten out of there. This is significant. Because turning the wheel, on the one hand, indicates awareness of the large Jeep Wagoneer behind the defendant, and by doing so avoids hitting the Jeep with all of the rear end of the Mustang. However, on the other hand, the defendant still hits the large white Jeep Wagoneer,

16

with half of the rear end of the Mustang; this demonstrates that the defendant knew he was going to hit the Jeep Wagoneer, and chose to hit the accelerator anyway in a hopeless escape attempt.

There's good reason to doubt that the defendant was merely turning around to go back out the way he came in. For example, there was testimony, at least from Agent Guillen, that the path the defendant took into the parking lot is narrow and Guillen expressed difficulty getting through when another car was heading out. Also, southbound traffic could turn into that pathway. *See* U.S. Exhibit 6c. Additionally, there was another pathway out of the parking lot in the opposition direction. *See* U.S. Exhibit 6a; U.S. Exhibit 6b (see bottom left screen). If the defendant was merely trying to get out of the parking lot as soon as he could, it seems unlikely that he chose to exit through the narrow passage way he came in through.



See U.S. Exhibit 9b (depicting the narrowness of the pathway)

After his arrest the defendant makes jail calls in Spanish. On December 14, 2025, the defendant made the following statement in a jail call,

> …when the lady comes to pay, show the f*****g videos, because I, yes, I did, I did crash into him, but tell them that I crashed into them, because when I reversed . . . I didn't

know it was a patrol car, because he signaled[13] to me to go in. I never thought it was a patrol car. So, when I . . . I reversed because the, the guy that I saw was, he was in front. So, he was in front and I . . . it was a police officer. I saw the green vest and everything, but... *See* U.S. Exhibit 12a, pg. 17.

Essentially, in this call, the defendant is admitting that he did crash into the Jeep Wagoneer. However, he claims that he did know it was "a patrol car," meaning he did not know Border Patrol was in it. Not knowing the vehicle was associated with law enforcement, is a conspicuous detail that he omitted from the FBI statement.

After that, on December 21, 2025, ten days after his arrest, the defendant refers to the crash as an accident, but then again claims to not know [the Jeep Wagoneer] was associated with law enforcement, by saying, "there was a big truck at the entrance. I – I never imagined that it was – that it was, that it was a patrol." See U.S. Exhibit 14a, at pg. 16. Later on, in that same conversation, the unknown male that the defendant is conversing with says, "I imagine that it was when you thought about going in reverse, but you didn't see that he got in your way;" and, the defendant replies, "exactly." See U.S. Exhibit 14a, at pg. 19. This is the first time that the defendant refers to not seeing the SUV. It is significant, that this occurred 10 days after the incident with an individual, based on the conversation that has been view the surveillance footage, and during the conversation discuss how the defendant could have evaded the immigration authorities. See U.S. Exhibit 14a, at pg. 19 -20. Notably, it was the other participant in the call who first suggested that the defendant did not see the large white Jeep Wagoneer.

*Deadly or Dangerous Weapon*

---

[13] On the Agent Guillen's body camera footage, U.S. Exhibit 4, the only hand signal that can be seen is at 2:04, after Agent Guillen pulled in behind the Mustang. The experienced translator that translated this call testifed in Court, and stood by her translation. A second translation was admitted into evidence without objection where the translation reads that Defendant said, "he let me go in front of him to go through," instead of signal. Defense Exhibit 1, pg. 13-14.

The parties stipulated that a motor vehicle can be used a deadly and dangerous weapon as contemplated in 18 U.S.C. § 111(b). *See* 100_Joint Exhibit – Trial Stipulations. Nevertheless, the Defendant's vehicle, a Ford Mustang, was 15.67 feet long, 6.17 feet wide, and weighed 3,460 pounds. *See* U.S. Exhibit 20, pg. 10. At the time of collision, Border Patrol Agent Gamez testified he felt the vehicle violently shake and the vehicle's sensors later malfunctioned. Consistent with Agent Gamez's testimony, video surveillance capturing the collision shows the vehicle's wheels shift to the left upon impact. *See* U.S. Exhibit 5 at 1:26; U.S. Exhibit 5-C. Agent Gamez had to return the vehicle to the rental facility and the vehicle had to be repaired. *See* U.S. Exhibit 22 at pg. 10, 14-19. Also, given the impact on the Jeep Wagoneer, a vehicle which weighed approximately 6, 000 pounds, it would have been dangerous for it to collide with Agent Guillen. As confirmed by Adam Hyde, if the Mustang had struck Border Patro Agent Guillen, "the collision trajectory would have likely impacted his legs and potentially wrapped his body onto the trunk of the vehicle." *See* U.S. Exhibit 20, page 18.

## IV.   **REBUTTAL**

In his opening statement, defense counsel presented the Assault on Federal Officer charge as something the agents concocted after the fact to cover themselves. However, the Court notice will that the Agents were referring to Assault on a Federal Officer charges soon after the collision. See U.S. Exhibit 4a, at page 4 ("We need to take pictures in case they want to A-F-O this"); See U.S. Exhibit 4, at 3:58 to 4:02. Also, Agent Guillen advised the defendant of his Miranda rights and told him, "What you did is now a felony." See U.S. Exhibit 4a, at page 6 -7; See U.S. Exhibit 4, at 6:30 to 7:45.

The Ford Mustang was left at the scene on the morning of December 11, 2025. There was a stipulation that "at some unknown point following the incident on December 11, 2025, the

Defendant's vehicle (the Ford Mustang) was repaired before law enforcement seized the vehicle on February 17, 2025." *See* 100_Joint Exhibit – Trial Stipulations. Besides that, the only other evidence in the record regarding the whereabouts of the vehicle during this time is in the expert report where it says, "the Ford Mustang was subsequently removed from the scene by Mr. Juan Manuel Merida-Tavera." *See* Exhibit 20, at page 20. Any additional arguments about the vehicle during that timeframe would involve facts that are not in evidence.

The defense has asserted that the defendant panicked. *See* Rec. Doc. 36, at pg 2. However, that is not supported by the evidence. The United States recalls that the agents testified to the defendant's calmness at the scene.

Without objection from the Government, secondary translations were entered into evidence for two jail calls. However, only one FBI linguist testified during the trial. She is responsible for the translations that are U.S. Exhibits 12a, 13a, and 14a. The U.S. recalls her testifying she stands by her translations and disagrees with the secondary translations. She is an experienced linguist that testified to doing many translations in the past. Furthermore, she testified to being familiar with the way Spanish is spoken near Mexico City, and Hidalgo. In U.S. Exhibit 23, the Court will see that the defendant was born in "HGO, MEX."

As far as his statement, the defendant was provided *Miranda* warnings in Spanish at the scene, which he indicated he understood.[14] He also received verbal *Miranda* warnings in English, at the FBI office, which he also indicated he understood. [15] He was given *Miranda* warnings in a third form, with a written waiver form that he was provided to read, which he

---

[14] *United States v. Gibson*, 108 F. App'x 975, 976–77 (5th Cir. 2004) ("Agent Spiers was not required to again warn Gibson of his rights after having done so that same day only an hour or so earlier")

[15] *United States v. Constantin,* NO. 19-36-SDD-RLB, 2019 WL 5847839, at 2 (M.D.La. Nov. 7, 2019). *See also United States v. Jin*, No. 4:21-CR-48-ALM-CAN-1, 2021 WL 6137594, at *6–7 (E.D. Tex. Dec. 2, 2021), *report and recommendation adopted*, No. 4:21-CR-48, 2021 WL 6135774 (E.D. Tex. Dec. 29, 2021) ("Non-native speakers can knowingly waive their *Miranda* rights, even if they have poor or broken English.").

expressed doubts as to understanding.[16] However, the special agent provided further explanation before the interview progressed. See U.S. Exhibit 1-a-2, at 0 – 1:30. And the agent testified as to the rationale as to proceeding with the interview, particularly in light of the ambiguous comment the defendant made.

During the interview, although the defendant spoke in broken English, he gave sensible and context appropriate answers. And Special Agent Anderson, during testimony, expressed confidence that he understood the defendant, and referenced making small talk with the defendant afterward.

Some of the details that the defendant provided during the interview were scattered or recalled out of order, but that's not particular to a language divide. It is significant that he twice says he was closed in and then says he tried to flee. It is also significant that after Special Agent Anderson asked him what happened first, the Defendant said, "I see them," and pointed to where the rearview mirror would be. This was a calm and conversational interview, where the defendant appeared comfortable. The Defendant was not pressured into that statements he made. Also, the Defendant was 42 years old at the time of the interview and had been in the United States for at least 17 years, meaning there's good reason to believe he understood the importance of what he was saying and what he was not saying.

Once the defendant parked the Ford Mustang in the parking stall, there was a car between him and the Dodge ram that the ICE Agents were in. And those Agents, appeared to still be getting out of the truck when the Defendant began to reverse Ford Mustang. See U.S. Exhibit 5 at 1:15 to 1;30. In other words, there was an obstruction between the Defendant and his view of the ICE agents in the Dodge ram to the left. However, as the expert noted in his report, there

---

[16] This lack of comprehension would seem to be English literacy related since the Defendant had previously expressed understanding of the verbal *Miranda* warning,

would not have been an obstruction to the defendant seeing the large white Jeep Wagoneer behind him. See U.S. Exhibit 20 at pg. 17.

## V.  CONCLUSION

Not only was the large white Jeep Wagoneer blatantly available to be seen by the Defendant, the Defendant had reason to be looking around, and he was observed to be looking around. He saw the large white Jeep Wagoneer. That fact is directly established by his statement that he was closed in—a statement made, not once, but twice. It's also proven by the fact that he said " I see them," and the agent noticed him looking and pointing where the rearview mirror would be. This is direct evidence of the defendant's intentional conduct. And, the defense's after that fact assertion that the defendant did not see the large white Jeep Wagoneer is unreasonable. Accordingly, the United States asks the Court to the Defendant find guilty beyond a reasonable doubt to the crime charged in the Indictment.

RESPECTFULLY SUBMITTED,

UNITED STATES OF AMERICA, by

KURT L. WALL
UNITED STATES ATTORNEY

/s/ Jeremy S. Johnson
Jeremy S. Johnson, TXBN 24094755
Assistant United States Attorney
451 Florida Street, Suite 300
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
E-mail: jeremy.johnson@usdoj.gov

/s/ Allen L. Ross
Allen L. Ross, LBN 36654
Special Assistant United States Attorney
451 Florida Street, Suite 300
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
E-mail: allen.ross@usdoj.gov