UNITED STATES

NO. 25-cr-181-JWD-EWD

VERSUS

EVODIO MERIDA-TAVERA

## POST TRIAL BRIEF ON BEHALF OF EVODIO MERIDA-TAVERA

This matter came before this Honorable Court on June 23, 2026 for trial of Evodio Merida-Tavera on charges of 18 U.S.C. §111 (a)(l) and (b). Undersigned counsel submits this Post Trial Memorandum pursuant to the Trial Court's Order to provide any final comments on behalf of the defendant, Evodio Merida-Tavera ("Tavera").

Ultimately, this case presents one narrow question: whether the Government proved beyond a reasonable doubt that Mr. Merida-Tavera intentionally assaulted a federal officer by intentionally driving his vehicle into the Jeep occupied by federal agents. The evidence establishes that a collision occurred. It does not establish beyond a reasonable doubt that the collision was intentional rather than the product of panic, distraction, poor judgment, and negligence while attempting to flee.

By his own admissions in his interviews with the FBI, Mr. Tavera was fleeing, was in a hurry, was nervous, and was distracted. These factors almost always lead to accidents and certainly did so in this case. A review of the evidence supports the fact that this was a parking lot accident and not a crime.

Not one of the government's witnesses presented any evidence to support the government's burden of proving intent.

**Testimony of Agents**

First, we have the testimony of the Border Patrol and ICE agents who were present at the time of the accident. Agent Gloyd, who was one of the officers in the black truck to the left of Mr. Tavera, was interviewed by the FBI after this incident. He stated twice (and confirmed in his testimony at trial) that Mr. Tavera, "backed up" into the Jeep.

At no time did he say he rammed, slammed, acted intentionally, or use any other words to show that Mr. Tavera acted on purpose, or that Tavera's actions were intentional. Recall also that Agent Gloyd was the officer who stated at trial that he saw Mr. Tavera's face through the windshield as Mr. Tavera was pulling his Mustang around the Jeep Wagoneer while he pulled his parking spot. Notably, Agent Gloyd said Mr. Tavera was acting suspiciously.

We agree with that. It's obvious that not only did Agent Gloyd see Mr. Tavera, but Mr. Tavera saw Agents Gloyd and Maxwell, who were in the black truck. A review of the video shows how slowly Mr. Tavera was driving when he was going in front of the Jeep Wagoneer (that had just backed up out of his way) as he pulled into the parking spot. There's no question that he saw Agents Gloyd and Maxwell in the black truck causing him to look around and act suspiciously.[1]

Likewise, Agent Guillen was interviewed by the FBI. He also told the FBI twice (and confirmed in his trial testimony) that Mr. Tavera "backed up" into the Jeep. Like Gloyd, he never used any language to indicate it was intentional.

Finally, we have Agent Gamez, who gave a statement to the rental car company, National, about what happened. This summary of the statement was introduced as Gov-22.

---

[1] In his statement to the FBI and in numerous jail calls, Tavera says he had no idea the white vehicle Jeep was immigration.

**Extract from Exhibit Gov-22**.

| Loss Info | | 1st Party Info | |
|---|---|---|---|
| **Date of Incident:** 12/11/2025 | **Time of Incident:** 03:36PM | **Renter Information** | |
| **Amount Owed:** | **Injuries Involved?:** No | IVAN GAMEZ | **Renter Insurer:** |
| **Status:** On Rent | **CDW:** Full Included in Rate | ********* *** ********* USA | **Policy Number:** |
| **Police Report #:** | | i*****1@yahoo.com | |
| **Department Name:** | | | **Claim Number:** |
| **Precinct:** | | | |
| **Incident Details:** CUST STATED THEY WERE BACKED INTO BY ANOTHER PARTY AND GAVE THE LICENSE PLATE BUMBER OF THE AT FAUL T PARTY (351AYD LOUISIANA). DAMAGE TO THE WAGONEER INCLUDES SCRAPES TO THE FRONT BUMPER ON PASSENGER SIDE AND MI SSALIGNMENT TO THE FRONT PASSNEGER TIRE THAT IS PULLING THE VEHICLE | | | |

The National Rental Car Agent wrote down that the customer stated they were "backed into by another party." Agent Gamez had no motive to minimize the event when speaking with National. His description was made in the ordinary course of reporting property damage, and therefore likely reflects his understanding of what had occurred that day.

The *only* evidence that the government relies on to try and find some proof of intent is the statement given by Mr. Tavera to the FBI several hours after the accident. It's important to note at the beginning of the video that Mr. Tavera is in a room with Border Patrol Agent Guillen and others while waiting for the FBI to get there.



**Gov-1a-1 (0:00 to 1:55)**

When the FBI agents arrive, Agent Guillen and the other agents leave the room exiting through a door behind Mr. Tavera.



**Gov-1a-1-(2:20)**

The significance of identifying this interaction in the video is because later when giving his statement to the newly arrived FBI agents, Tavera points behind him when he discusses Border Patrol Agents. The government, in their pretrial brief and somewhat at trial, misinterpreted this pointing. They believe that Mr. Tavera was talking about agents at the scene of the accident when, in fact, he was talking about the agents who had just left the room out of the door behind him.

See, for example, one of the first times that he says, "those guys." Mr. Tavera refers to the Border Patrol Agents by pointing behind him. [2]

> **FBI SA Anderson:** Was it federal law enforcement officers?
>
> *The defendant points backwards with right hand*
>
> **Defendant:** These guys.
>
> **FBI SA Anderson:** Border Patrol
>
> *The defendant points backwards with right hand*
>
> **Defendant:** No, these guys.

**Gov-1, p. 6 (Transcript)**

**Gov-1a-2 at 4:55 (Video)**

---

[2] Gov-1, Page 6 / Gov. 1a-2 at 4:55

Several times in his statement to the FBI, Tavera points behind him when referring to Border Patrol or Agents. [Gov.1a-2 at 4:34, 4:53, 4:55; Gov.1a-3 at 0:03] It is obvious that he is referring to the agents who just left the room out of the door behind him. Again, the government has misinterpreted this body language. As defense counsel mentioned in his opening statement, for some reason the government cannot grasp the concept of someone describing an event after it happened.

There's no question that Mr. Tavera says that the agents closed him in. There is no question that he says that he backed into them. Of course he said that because that's exactly what happened. He never states that he intentionally backed into anything, including the large white Jeep Wagoneer.

Regrettably, during the interview the FBI agents never clarified these important points. Based on the circumstances and the alleged belief that his action rose to the level of assault, these agents should have clarified this point, especially, having full knowledge that Mr. Tavera's first language is not English.

After reading Mr. Tavera his rights, Agent Anderson hands him a document and asks, "Are you able to read English? Do you want a …" Mr. Tavera answers, "not really, man." [Gov-1a-1-3:37][3]

A review of the video shows that Mr. Tavera says, "I understand most, uh, uh, most, not all of them," to which, Anderson replies, "which ones do you not understand?" [Gov-1a-2-0:04]. That is when Mr. Tavera says, "I think it's better to, like, not to say anything right now because." [Gov-1a-2-0:40]. Agent Anderson goes on to explain his right to remain silent but, never asks him specifically which rights he did not understand. Additionally, on cross examination at trial, Agent

---

[3] Gov-1, Page 1 (Transcript of Interview)

Anderson stated that Mr. Tavera's statement that he better "not say anything right now," in his opinion did not mean that he was invoking his right to remain silent. So, he continued to question Mr. Tavera.

There were other instances in the interview that should have raised red flags with the FBI agents about Tavera's ability to understand what was going on. Agent Chambers asks him, "What is your name?" To which Mr. Tavera says, "Evodio, like. My this on …over there but I don't know how to spell it like." Mr. Tavera attempts to explain that he cannot spell his name but could write it.[4][Gov-1a-2-1:43]. Mr. Tavera's admission that he could not spell his own name is not an insignificant fact. Rather, it is direct evidence of limited reading ability. Agents never asked him about educational background. It is common sense that an individual unable to spell his own name is unlikely to possess the reading comprehension necessary to understand a written waiver of constitutional rights without careful explanation in a language he fully understands.

Mr. Tavera does his best to get through the interview in his limited English. In fact as FBI Agent Anderson testified at trial, he asked him more than once how the accident happened because as Anderson said, his events were out of order. This is true. For example, the first time he is asked what happened, Tavera says, "Yes, I park it. And they like, they tried to catch me. They catch me. They break my window. Like they push my window, no reason. I say hey wait wait. I tried to run, I do reverse. I tried to runaway, but I hit his car."[5] [Gov-1a-2-4:06]

It is blatantly obvious that Tavera is not telling the story in order. This could be due to a language barrier or any other number of reasons, but no one contests that he is telling the story out of order. However, the government seizes on this lack of order when it appears to be favorable to

---

[4] Gov-1, Page 2-3

[5] Gov-1 Page 5

their case. For example, in exhibit Gov-1, Anderson asks Tavera, "if the car you backed into when you were trying to get away, did it have lights and sirens on it?" Answer: No, because look…my job, I stopped where I tried to get out. After that they closed my way. So I tried to run away. [Gov-1a-3-0:33]

For some reason, the government interprets this to be an admission that after they closed his way, he tried to run away. It is not an admission; it is a statement he is giving to the best of his ability in his second language of an event that has already occurred. Clearly, the government knows that he has told parts of his story out of order. [Gov-1a-3-2:06]

Again, when being questioned, Tavera says: "Yea, I know, yeah, I think maybe it's my mistake." [Gov-1a-3-1:11]. At no time did the government challenge that statement and ask if he did this on purpose.

Towards the end of the interview, Anderson asks "is there anything else important about what happened today that you want us to know. Tavera's response: "No, they catch me for like no reason." Agent Chambers respond, "well, the reason is that you are here illegally and you tried to avoid arrest." [Gov-1a-3 at 3:40]

This was the prime opportunity for the agents to say, you are here because you intentionally assaulted a federal officer. You intentionally ran your car into a Jeep. But they failed to do so. They simply focused on the fact that he was here illegally and he tried to run, which we have always agreed to. It is still unclear why the FBI agents did not clarify many of Tavera's statements.

**The Expert Witness**

The fact that the government hired a reconstruction specialist (Adam Hyde) supports the position that the cause of this accident is uncertain. If there was no reasonable doubt that Tavera intentionally rammed his vehicle into the Jeep, then why did the government need to hire an

accident reconstruction specialist?  Mr. Hyde's analysis establishes only the mechanics of the collision. At most, his testimony demonstrates how the collision occurred. It does not establish why it occurred.

In fact, Mr. Hyde supports the position that this was not intentional. First, he notes the speed and g-force of this Mustang. Both were very low. He posed on page 17 of his report [Gov- 20], the g-force was consistent with someone who was backing out with more than 20 feet available behind them.

Hyde said drivers who intend to back rapidly or travel a distance greater than approximately 20 feet exhibited greater backing accelerations than drivers performing a typical parking stall backing maneuver. The report goes on to say that a driver who reaches an acceleration factor of 0.05 is 95% likely to be either backing rapidly or intending to travel a longer distance in reverse. Mr. Tavera was 0.1 according to this expert and he had approximately 53 feet to back up.[6]

Moreover, Mr. Hyde admitted that this Mustang with a V6 engine has a significantly higher acceleration rate. When asked how that would compare to the rate if in fact the pedal been completely depressed to the floor, he declined to answer. While he acknowledged that the Mustang could go from zero to 30 in 2.2 seconds, he declined to agree with defense counsel because in this case, the car was going backwards.

Next, the expert also supports the hypothetical position that *if* Mr. Tavera saw the Jeep before backing up, he tried to avoid it and simply misjudged and hit the car. This of course is negligence.

---

[6] Gov-20, Page 6.





**Figure 21. Incident Starting Locations Ford and Jeep**

**Figure 22. Final Rest Configuration Ford and Jeep**

Gov-20, p.15. Figure 21 depicts the location of the Mustang and the Jeep. Figure 22 depicts Mr. Tavera's position at the point of impact. It's clear he turned his wheel to the left. Everyone agrees that he turned his wheel to the left. See scene photos. [Gov-8 a, b, c, and g]

If Mr. Tavera intentionally wanted to hit the Jeep, the best thing he could have done is going straight back. That would have guaranteed a hit. Turning the wheel is indicative of someone trying to avoid the collision or someone who never saw the Jeep, which is the most likely scenario.



The picture above from the actual incident shows that the Jeep did not completely cover the back of the Mustang. When questioned, the expert attributed this discrepancy to an optical illusion.



**Figure 29. Ford Left Steer Driver Input**

The expert's own notations on the actual incident photo included in his report at Gov.20, p.21. Figure 29, identifies and circles in red, proof that Mr. Tavera turned his wheel; he was not targeting the Jeep when backing up.

There was no evidence that Mr. Tavera continued to accelerate after coming in contact with the Jeep. There's no evidence he attempted to go forward. He simply collided with the Jeep and as the expert stated, his brake lights were on. The expert also confirmed that this 2007 Mustang had no backup camera and had no backup sensors that would have beeped to alert the driver.

The agents on the scene of the accident also confirmed that they gave no indication of any type to Mr. Tavera that they had pulled up behind him. There were no flashing of the lights, no tapping of the horn, or no verbal orders to get out of the car before the collision. Although there was damage to both vehicles, it was relatively light. In fact, the airbags on neither vehicle deployed. It would seem that if a driver was intentionally trying to ram a vehicle behind him he would have struck it much harder for maximum impact and would not have turned away. Turning left is inconsistent with intentional ramming.

**Failure to Preserve Evidence of a Deadly Weapon**

Perhaps the most compelling evidence that no one thought this was a crime on the day of the accident is the fact that the officers left the Mustang at the scene of the accident for the family to retrieve. This was confirmed by every officer who testified.

This violates all rules of crime scene investigation and all rules of common sense. If this Mustang is a deadly weapon, which the government proposed and to which the defense agreed, then why would it be left at the scene of the crime? Why would the government wait over 60 days to ask for the Mustang back so that it could be evaluated or analyzed? The most logical answer is that this was not a crime. The evidence supports the position that this was an afterthought to make this parking lot accident into a crime. By their own admission, the officers did not follow procedures mandated in "Catahoula Crunch". As Officer Guillen testified, the purpose of Catahoula Crunch was to detain *previously identified criminals or immigration violators*. Of the three people detained that day none of them met that criteria. Most importantly, none of them were the individual they were allegedly surveilling. Perhaps they needed a crime to justify their actions.


**Jail Calls**

The translators testified there were 50 jailhouse calls that had to be listened to and translated. Of those 50, the government identified eight in pre-trial discovery as being significant to their prosecution. Ultimately, the government only used 3 at trial. Due to the Federal Rules of Evidence, the remaining calls could not be used or be presented in evidence.

Excerpts from calls of Mr. Tavara at a correctional facility talking to his brother show that this was an accident.

Gov-12a, page 17 of the transcript of December 14, 2025, Mr. Tavara says,

"That's good. That's good because maybe [UI]…because I, yes, I did, I did crash into him, but tell them I crashed into them, because when I, when I reversed, . . . I didn't know it was a patrol car, because signaled me to go in. I never thought it was a patrol car. So, when I . . . I reversed because the, guy that I saw was, **he was in front.** So, he was in front and I …it was a police officer. I saw the green vest and everything, but -- (emphasis added)[7].

The second interpretation introduced by the defense as Def-1 is pretty close, but instead of

saying he signaled me to go in, he says on page 13-14,

". . . because he let me go in front of him to go through. I never imagined that it was a patrol car. So then when I reversed, the, the guy that I saw was in the front, so he was in the front, and I—it was a police officer…"

The significance of this phone call is that Mr. Tavera says in both versions that the guy that he saw

**was in the front.**

Gov-14a is a call from December 21, 2025. On page 16 Mr. Tavera says to an UM:

| EMT: | [OV] --the thing is that I [UI] by accident. [UI] no, no, it was not my intention, dude. I did it-- |
| --- | --- |
| UM2: | [OV] Because with the intention-- |
| EMT: | --because, because [UI]-- |
| UM2: | [OV] --you, did you resist, dude? |
| EMT: | No, I didn't resist. The thing is that I--well, I was going to run, yes. |

The second interpretation introduced by the defense as D-3, Mr. Tavera states on page 12-13:

| EMT: | --I hit it by accident, that hit, it wasn't, wasn't my intention, dude. I did it because-- |
| --- | --- |
| UM: | [OV] [UI] |
| EMT: | --because— |

---

[7] This is one of the calls that was interpreted by two different people.

| | |
|---|---|
| UM: | [OV] Did you-you resist, dude? |
| EMT: | No, no, I didn't resist. What happened is that I-- well, or that is, I was going to run, yes. |

In both translations Mr. Tavera says, "I hit it by accident, it was not my intention."

Additional conflicting translations in this same call are on Gov-14a, page 17:

| | |
|---|---|
| EMT: | -- at the moment that I, that I went by, he let me through, he gave me [UI] because he saw that . . . I mean, I stayed behind a bit. And I--I-- |
| UM2: | [OV] Mm-hmm. |
| EMT: | -- the dude moved so then I went in. In that moment that I went into the--the parking lot, I saw the cop that was . . . in other words, I realized it was . . . that dude that was behind me-- |
| UM2: | [OV] He was-- |
| EMT: | --I didn't even know he was immigration. I noticed the one that was-- |

Def-3 is a second translation of the same conversation, Mr. Tavera, page 13.

| | |
|---|---|
| EMT: | --when I went by in the truck, he gave me the right-of-way, he gave me-- because he saw there was a gap [PH] in the back, and I, I-- |
| UM: | [OV] Mm-hmm. |
| EMT: | --he saw the guy, so then I went in. And once I got in the, in the parking lot, I saw the police officer that was--or that is, I didn't notice that he was--the guy that was in the back-- |
| UM: | [OV] Uh-- |
| EMT: | --I didn't even notice that he was Immigration. I noticed the one that was-- |

In the second translation, Mr. Tavera emphatically states that he did not realize that the Jeep was behind him.

Finally, on the same date, Gov-14a – The transcript reflects the following:

| | |
|---|---|
| UM2: | [OV] Because if they had not burned you--because in that moment that he told him that, that maybe you were--what you were--uh, and that you didn't have papers, dude, that's why that dude got close by right away, dude. I imagine that it was when you thought about going in reverse, but you didn't see that he got in your way. |
| EMT: | [OV] Exactly, exactly. I didn't notice. I-- |
| UM2: | [OV] Uh-huh, because-- |
| EMT: | --well, I--[stutters] like I told you, I didn't even notice that this guy was a cop. I-- I'm telling you, that I passed so sure of myself because the dude let me pass. I was [UI]-- |
| UM2: | [OV] Uh-huh, yes. |
| EMT: | --I was barely going to step on it when the dude moved out of the way. He let me pass and I went to park. When I parked, I saw that the other dude on the side, the side, well yes--I saw him. |

A second interpretation of the conversation confirms that Mr. Tavera did not see the Jeep. [Def-3]

| | |
|---|---|
| UM: | [OV] Because if they had not snitched on you-- Because at that moment that he told him, dude, that, that you were possibly, that, that you were what you are and that you didn't have any papers, dude, that is why that dude got followed you so fucking quick, dude. And I imagine that's when you thought about reversing, but you didn't notice that he-- |
| EMT: | [OV] Exactly. |
| UM: | --had blocked you in. |
| EMT: | [OV] Exactly. Exactly. I didn't realize it, well, I-- Like I'm telling you; I didn't even realize that this guy was, was a police officer. I--I'm telling you I passed confidently because the dude gave me the right-of-way. I was there-- |
| UM: | [OV] Uh-huh. Yes. |
| EMT: | --I was just going to honk, when the guy moved out of the way. So, he gave me the right-of-way, and I went to park. And once I parked, then I saw the other guy on the side, on the side-- |

The government wants to pick and choose statements from Mr. Tavera, both in the FBI interview and in the jail calls, disregarding other statements. Due to a quirk in the Federal Rule of Evidence the Court won't hear the other phone calls but can probably imagine what was said in them.

**Conclusion**

When Mr. Tavera said during his interview that he was in the country illegally, the Agents accepted that as true. When he said he was trying to flee, they accepted that as true. Later, however, when it became known that he said that backing into the vehicle was an accident, they refused to accept that as true. The government was very selective in the evidence that they considered when prosecuting this case.

Throughout this case the government has refused to accept or understand the very simple concept of a person describing an event after it happened.

Based on all of the evidence produced at trial, it is clear that this was a parking lot accident and not a crime. Mr. Tavera is not guilty.

Respectfully submitted:

/s/John S. McLindon
John S. McLindon
Attorney at Law   LA Bar No.19703
7967 Office Park Blvd., Suite B
Baton Rouge  LA  70809
Telephone: 225-408-0362
Cell: 225-603-6493
Email: john@mclindonlaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 1st day of July, 2026, the foregoing was filed electronically with the Clerk of Court using CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

/s/John S. McLindon
JOHN S. McLINDON