**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**

**CRIMINAL ACTION**

**VERSUS**

**NO. 25-181-JWD-EWD**

**EVODIO MERIDA-TAVERA**

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

The instant case is *United States v. Evodio Merida-Tavera*, Criminal No. 25-181. Pursuant to the request and consent of the parties, (*see* Doc. 31), the Court presided over a bench trial beginning June 23, 2026, and concluding June 24, 2026, (*see* Docs. 45, 46). At the close of the bench trial, the Court stated its intent to make findings of fact and conclusions of law *in writing*. *See* Fed. R. Crim. P. 23(c); *see also United States v. Hogue*, 132 F.3d 1087, 1090 n.3 (5th Cir. 1998) (citing 2 *Wright & Miller's Federal Practice & Procedure* § 374 (2d ed. 1982)) ("Some judges make findings in all criminal cases in which the jury is waived, even though there has been no request from a party."). To that end, the Court requested that the parties file post-trial briefs. Neither party objected to the Court's proposed briefing and decision-making schedule, (Doc. 46), and both parties timely filed their respective post-trial briefs, (Docs. 48, 49).

The Court has carefully considered all arguments and evidence properly before it, as well as relevant legal authorities, binding and persuasive. For the following reasons, the Court now finds Defendant Evodio Merida-Tavera **NOT GUILTY** of the charges in the *Indictment* (Doc. 1).

**I.    PRELIMINARY NOTE**

In its proposed instructions, the Government incorporates § 1.05 of the Fifth Circuit Pattern Jury Instructions, entitled "Presumption of Innocence, Burden of Proof, Reasonable Doubt." (Doc. 40 at 1 (citing FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: CRIMINAL § 1.05 (2024)).)

Like the Government, the Court underscores the Fifth Circuit's most fundamental instruction: "[T]he defendant is presumed by the law to be innocent. . . . The law does not require [the] defendant to prove his innocence or [to] produce any evidence at all[,] and no inference whatever may be drawn from the election of [the] defendant not to testify." FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: CRIMINAL § 1.05 (2024) (cleaned up). Instead, "[t]he government has the burden of proving the defendant guilty beyond a reasonable doubt." *Id.*

"Proof beyond a reasonable doubt . . . is proof of such a convincing character that [one] would be willing to rely and act upon it without hesitation in making the most important decisions of [one's] own affairs." *Id.*; *accord Victor v. Nebraska*, 511 U.S. 1, 20 (1994) (defining "reasonable doubt" as "a doubt that would cause a reasonable person to hesitate to act," and noting that the Supreme Court has "repeatedly approved" this definition of the concept). This Court has, on several occasions, used the example of marriage to communicate the threshold for reasonable doubt: Much as one should be unflinchingly sure of the decision to marry another person, one should be unflinchingly sure of the decision to *convict* another person.

As the Fifth Circuit's jury instructions and this Court's example both suggest, the Government's burden "is a strict or heavy" one. FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: CRIMINAL § 1.05 (2024). There is good reason for the high bar. The requirement of proof beyond a reasonable doubt "provides concrete substance for the presumption of innocence" and is therefore "a prime instrument for reducing the risk of convictions resting on factual error." *In re Winship*, 397 U.S. 358, 363 (1970). As Justice Brennan so neatly put it:

> The requirement of proof beyond a reasonable doubt has this vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and

2

freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt.

*Id.* at 363–64; *see also Davenport v. United States*, 146 S. Ct. 429, 430–31 (2025) (treating as a given the "central importance of the reasonable-doubt standard to criminal procedure," and quoting *In re Winship*, 397 U.S. at 364, with approval).

This Court has taken seriously its duty to hold the Government to the "strict or heavy" burden of proving Merida-Tavera's guilt beyond a reasonable doubt. As discussed in detail below, the Court has substantial—not just reasonable—doubt about Merida-Tavera's guilt, based on the sparse and inconclusive evidence concerning whether Merida-Tavera knew that the Jeep Wagoneer was behind him and/or whether Merida-Tavera knew that he would hit the vehicle when reversing. This substantial doubt compels the verdict here.

## II.    PROCEDURAL BACKGROUND

### A.    Pre-Trial

On December 17, 2025, a Grand Jury indicted Merida-Tavera for allegedly violating 18 U.S.C. § 111(a)(1) and (b). (Doc. 1.) Specifically, the *Indictment* charged that, on or about December 11, 2025, Merida-Tavera used a "deadly and dangerous weapon"—a motor vehicle—in order to "intentionally and forcibly" assault, resist, oppose, impede, intimidate, or interfere with "Agent-1" and "Agent-2," employees of the United States Border Patrol ("Border Patrol"), who were, at the time, "engaged in the performance of their official duties." (*Id.*)

Merida-Tavera is currently in custody. (*See* Doc. 4 at 1–2; Doc. 6.) Trial was set for March 4, 2026, (Doc. 4 at 2), but was continued twice at the Government's request and over the Defense's objection, (*see* Doc. 26 at 1; Doc. 35 at 2). The case was ultimately set for a 3-day bench trial beginning June 23, 2026. (*See* Doc. 35 at 2; *see also* Doc. 31 (approving Merida-Tavera's waiver

of jury trial and the parties' consent to bench trial).) The parties timely filed their pre-trial briefs and proposed instructions. (*See* Docs. 36–40.) Neither party filed any motions *in limine*.

The parties' pre-trial briefs reflect general agreement about many of the facts of this case. (*See* Docs. 36, 39.) Likewise, the parties generally agree that the Fifth Circuit's jury instructions capture the elements of 18 U.S.C. § 111(a)(1) and (b) and are therefore appropriate for use by this Court. (*See* Docs. 37, 40 (quoting, at length, FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: CRIMINAL § 2.07 (2024)).) Momentarily, the Court will discuss in considerable detail both the facts of this case and the applicable law. For now, the Court wishes to emphasize that, even pre-trial, the parties' consensus—if only implied—was that this case turns on one question: Did Merida-Tavera have the requisite intent to *forcibly* assault, resist, oppose, impede, intimidate, or interfere?

### B.    Trial

During the bench trial, both parties delivered short opening statements. The Court then heard from the following witnesses: (1) Border Patrol Agent Jesus Guillen, (2) Federal Bureau of Investigations ("FBI") Special Agent Jordan Anderson, (3) Immigration and Customs Enforcement ("ICE") Agent Christopher Gloyd, (4) ICE Agent Levi Maxwell, (5) Border Patrol Agent Ivan Gamez, (6) FBI Linguist Dalila Huerta, and (7) Accident Reconstruction Expert Adam Hyde. The parties also introduced a number of exhibits, mostly recordings, transcripts, and photographs.[1]

At the close of the Government's case, the Defense moved for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29(a). The Court ultimately denied that motion. (Doc. 46 at 1.) Thereafter, the Defense also rested, without calling any witnesses.

### III.    FACTUAL BACKGROUND

### A.    Underlying Incident

---

[1] The parties provided these exhibits to the Court in advance of trial. At the pre-trial conference on June 18, 2026, neither party opposed the Court's viewing the exhibits before trial. (Doc. 41 at 1.)

### 1. *Prelude*

The parties do not dispute the following: Merida-Tavera is a Mexican national who is in the United States illegally. (*E.g.*, Ex. 1-a-2 at 03:08–03:11.)[2] He has lived in the United States for a cumulative 17 to 18 years—from 2007 to 2010, and then again from 2011 to present. (*Id.* at 03:11–03:34.) Merida-Tavera worked at a restaurant in a shopping center located along Bluebonnet Boulevard, in Baton Rouge, Louisiana. (*Id.* at 03:36–03:57; *accord* Doc. 36 at 1.)

The incident giving rise to the present charges took place on December 11, 2025. (Doc. 1.) On that date, Border Patrol Agents Guillen and Gamez were deployed and working in Baton Rouge as part of an immigration enforcement operation dubbed "Catahoula Crunch." (*See also* Doc. 39 at 3 (noting that Border Patrol was "conducting immigration enforcement operations" in Baton Rouge).) Gamez rented a white Jeep Wagoneer ("the Wagoneer"). (*See* Ex. 22 at 11, 13.) This vehicle was unmarked. (Exs. 11–11-c.) Guillen was driving; Gamez was riding in the back seat.

On the morning of December 11, 2025, Guillen and Gamez were waiting in the Wagoneer outside an apartment complex. According to Guillen, the agents were there in order to apprehend a specific individual, whose identity and address had been disclosed to the agents as part of a "target packet." According to Gamez, the agents were there for the general purpose of surveilling the area. In either case, the agents were occasionally running the license plates of nearby vehicles.

At one point, the agents ran the license plate of an orange Honda and began trailing the vehicle for several miles.[3] While heading south on Bluebonnet, the orange Honda turned right into

---

[2] Except where otherwise indicated, "Ex." refers to the Government's Exhibit.

[3] According to Guillen, the agents ran the orange Honda's plate because of the age and model of the vehicle. According to Gamez, the agents ran the plate because the vehicle was coming from an area inhabited by many individuals who are present in the United States illegally. Guillen testified that the agents began following the orange Honda because it was taking an unusually long time to run the plate. Gamez testified that the agents began following the orange Honda because the plate came back as registered to someone who was possibly in the country illegally. Guillen stated multiple times that the driver of the orange Honda was acting suspiciously/nervously, although he acknowledged on cross-

an alley leading into an employee parking lot located behind the aforementioned restaurant. The agents followed the orange Honda into the alley and effected a stop at roughly the point where the alley opened into the parking lot. After determining that the driver of the orange Honda was present in the United States illegally, the agents handcuffed him; Gamez put the driver in the far back row of the Wagoneer, while Guillen parked the orange Honda in an empty parking space. (*E.g.*, Ex. 3 at 01:37–4:00; Ex. 2 at 01:34–03:57.) There were empty parking spaces on either side of the orange Honda. (*E.g.*, Ex. 5 at 00:47–00:50.)

There were two entrances to/exits from the parking lot: the alley off Bluebonnet—at the north end of the shopping center—and a second entrance/exit from the south. (*See, e.g.*, Exs. 7-a, 7-c.) Shortly after Guillen and Gamez apprehended the driver of the orange Honda, a black Dodge truck ("the black truck") entered the parking lot from the south and parked adjacent to the orange Honda. (Ex. 5 at 00:55.) The black truck was occupied by ICE Agents Maxwell and Gloyd. Maxwell was driving; Gloyd was riding shotgun. Like Guillen and Gamez, Maxwell and Gloyd were deployed and working in Baton Rouge as part of Catahoula Crunch. These agents were a "special response team," present for the purpose of supporting Guillen and Gamez.

### 2. Collision

Maxwell and Gloyd remained seated in the black truck. Guillen and Gamez were in the Wagoneer, which was still located at roughly the point where the alley off Bluebonnet opened into the parking lot. (*E.g.*, *id.* at 00:54.) Once again, Guillen was in the driver's seat, and Gamez was in the back seat. At this time, Merida-Tavera tried to enter the parking lot from the alley. He was driving a gray Ford Mustang ("the Mustang"). The driver of the orange Honda was Merida-

---

examination that he did not include this detail in his report. Gamez did not mention any suspicious/nervous behavior. Rather, he testified that the driver of the orange Honda was driving normally.

Tavera's co-worker. From the far back row of the Wagoneer, the driver of the orange Honda advised Guillen and Gamez that Merida-Tavera was also present in the United States illegally.

The Wagoneer pulled forward in order to give the Mustang space to enter the parking lot. (*E.g.*, *id.* at 00:54–01:04.) The Mustang then passed the Wagoneer on the left and began to pull in front of the Wagoneer—into the empty parking space to the right of the orange Honda (i.e., one car over from the black truck). (*Id.* at 01:03–01:13.) While the Mustang was passing, the Wagoneer backed up slightly. (*Id.* at 01:10–01:13.)

At trial, Gloyd testified that, from his position in the front passenger seat of the black truck, he could see Merida-Tavera looking around and looking back at the Wagoneer while entering the parking lot. On cross-examination, Gloyd agreed that Merida-Tavera could probably also see Maxwell and/or Gloyd through the windshield of the black truck. Gloyd acknowledged that, once Merida-Tavera parked on the other side of the orange Honda, Gloyd could no longer see him. Maxwell testified that, from his (closer) position in the driver's seat of the black truck, he could only see Merida-Tavera's outline. Maxwell did not recall seeing any unusual behavior by Merida-Tavera. Likewise, he did not recall Gloyd's saying anything when the Mustang entered the parking lot. At this time, all four agents—Guillen, Gamez, Maxwell, Gloyd—were wearing tactical vests which clearly identified the agents as law enforcement. (*E.g.*, Ex. 5 at 01:22–01:28; Ex. 4 at 02:22.)

Once the Mustang parked, the Wagoneer pulled forward and behind the Mustang. (Ex. 5 at 01:13–01:18.) According to Expert Hyde, the Wagoneer's front bumper was more or less lined up with the left side of the Mustang. (*See* Ex. 20 at 16 (Figure 23).) There were 5.7 to 6 feet of space between the rear bumper of the Mustang and the right side of the hood of the Wagoneer. (*See id.* (Figure 24).) The hood of the Wagoneer was taller than the rear bumper of the Mustang, meaning that the hood of the Wagoneer was probably visible to a person looking in the rearview mirror of

the Mustang. (*See, e.g.*, *id.* at 13; Exs. 8-b, 8-c.) The agents did not give Merida-Tavera any warning that the Wagoneer had pulled behind the Mustang, however. Guillen did not, for example, honk the horn, use his lights, activate a siren, or order Merida-Tavera to exit the Mustang. On cross-examination, Guillen testified that he has received instruction on high-speed chases but has not been trained in how to block in other vehicles.

The Mustang was stationary for approximately 5.5 seconds while the Wagoneer was behind it. (*E.g.*, Ex. 5 at 01:18–01:23.) During that time, Guillen began exiting the Wagoneer, and Maxwell and Gloyd began exiting the black truck. (*Id.*) More or less contemporaneously, the Mustang pulled forward a short distance over 0.19 seconds, stopped for 0.43 seconds, and then reversed for approximately 2.0 seconds, after which it collided with the front right tire and bumper of the Wagoneer. (*Id.* at 01:23–01:26; Ex. 20 at 9.) The Mustang's front left tire was turned, indicating that Merida-Tavera had cut the steering wheel to the left (i.e., counter-clockwise). (*See, e.g.*, Ex. 8-c.) And indeed, the Mustang reversed in a leftward direction. (Ex. 5 at 01:23–01:26.) Surveillance footage and body-worn camera ("BWC") footage both show a sizeable gap between the Wagoneer and the orange Honda (i.e., to the left), through which the Mustang could ostensibly have maneuvered. (*Id.* at 01:19; *see also* Ex. 4 at 05:24–05:34.)

At trial, multiple agents testified that, pre-impact, they heard the sound of the Mustang's engine; likewise, multiple agents testified that they heard the sound of the collision. But no agent testified that, *post*-impact, he continued to hear, e.g., the sound of the engine or the spinning of tires. Indeed, the Government's accident reconstruction expert, Hyde, testified that the Mustang's brake lights were illuminated 0.3 seconds after impact. (*See also* Ex. 4 at 02:13.) Hyde also testified that the Mustang's engine did not continue revving post-impact. Nor did the Mustang's tires continue spinning post-impact.

According to Hyde, the Mustang's impact speed was 4.3 to 4.6 miles per hour. (Ex. 20 at 16–17.) The acceleration rate was 3.30 ft/s², or roughly 0.1 g. (*Id.* at 17.) Compared to one study, the Mustang's speed and acceleration rate were both above average. (*See id.*) On cross-examination, however, Hyde testified that he did not know how fast the Mustang could go in reverse and therefore could not say how hard Merida-Tavera was pressing the accelerator at the time of impact.[4] The Mustang did not have backup cameras or sensors. Post-collision, the agents did not secure the Mustang as evidence, and so the Mustang's "black box" data—which may have provided additional, more definitive information—was lost.

With Merida-Tavera behind the wheel, the Mustang weighed approximately 3,460 pounds. (*Id.* at 10.) The Wagoneer, on the other hand, weighed approximately 6,260 pounds. (*Id.*) In surveillance footage, the Wagoneer can be seen rocking somewhat at impact. (*E.g.*, Ex. 5 at 01:26–01:27.) The impact also caused the Wagoneer's tires to turn sharply leftward. (*Id.*) Both vehicles sustained some damage. No airbags deployed, however. And no one was injured as a result of the collision. Guillen was the closest agent. (Ex. 4 at 02:10–02:12.) He was crossing in front of the Wagoneer and was near the left headlight. (Ex. 20 at 14.) In BWC footage, his shadow is visible across the back of the Mustang. (Ex. 4 at 02:11–02:12.) Gamez was still in the back seat of the Wagoneer. (*See* Doc. 48 at 19.) Guillen and Gamez both testified that they feared for their safety.

### 3. Apprehension

After impact, Guillen and Maxwell quickly approached the driver's side door of the Mustang. (Ex. 4 at 02:13–02:18.) Maxwell smashed the glass, opened the door, and removed Merida-Tavera from the vehicle. (*Id.* at 02:17–02:29.) Guillen then handcuffed him. (*Id.* at 02:29–02:52.) At trial, the agents testified that Merida-Tavera appeared calm while being apprehended.

---

[4] Traveling forward, the Mustang could go from 0 to roughly 30 miles per hour in 2.2 seconds. (*See* Doc. 49 at 8.)

(*See id.* at 02:17–05:19, 05:49–08:35.) Guillen gave Merida-Tavera his *Miranda* warnings in Spanish. (*Id.* at 06:29–07:28.) Ultimately, the agents took Merida-Tavera in for questioning.

Using his cellphone, Guillen photographed the damage to the Mustang and to the Wagoneer. (*Id.* at 05:20–05:48.) As mentioned above, the agents did not seek to impound the Mustang; rather, they left it at the scene of the collision for Merida-Tavera's family to retrieve.

On direct examination, the agents testified that Merida-Tavera did not say that the collision was accidental. But on cross-examination, the agents also acknowledged that Merida-Tavera neither said nor indicated that he knew that the Wagoneer had pulled behind the Mustang, that he intended to hit the Wagoneer, or that he knew that he would hit the Wagoneer. Both Guillen and Hyde testified that they did not think that Merida-Tavera could have escaped without hitting the Wagoneer. But each admitted that he did not know whether Merida-Tavera so much as looked in the rearview mirror before reversing. And each conceded that he did not know what Merida-Tavera was thinking when backing up.

### B.      FBI Interview

FBI Agent Anderson and FBI Agent Rob Chambers interviewed Merida-Tavera post-collision. Anderson testified that he had no prior familiarity with Merida-Tavera. Likewise, Anderson had limited knowledge of the underlying incident.

Anderson's first question to Merida-Tavera was: "Do you understand English?" (Ex. 1-a-1 at 02:33–02:41.) Merida-Tavera responded, "A little, yeah." (*Id.*) Anderson then advised Merida-Tavera of his rights in English and handed Merida-Tavera an "Advice of Rights" form, which was entirely in English. (*Id.* at 02:55–03:39; Ex. 1-l.) When asked whether he could read English, Merida-Tavera answered, "Not really, man." (*Id.* at 03:36–03:39.) Similarly, when asked for his

name, Merida-Tavera stated that he did not know how to spell it aloud and ultimately asked if he could instead write it down. (Ex. 1-a-2 at 01:42–02:22.)

Anderson asked if Merida-Tavera wanted an explanation of any of the rights listed in the Advice of Rights form. (*Id.* at 03:40–03:44.) After a couple of minutes, Merida-Tavera replied, "I think that—yeah—that better to—to—like, not to say nothing right now because . . . ." (Ex. 1-a-2 at 00:39–00:46.) At trial, Anderson stated that he understood Merida-Tavera to be asking a question about his right to remain silent. And because Merida-Tavera had not unambiguously invoked his right to remain silent, Anderson continued the interview—still in English. (*Id.* at 00:46–01:24.) Anderson acknowledged that Merida-Tavera clearly did not speak English as a first language and that Merida-Tavera frequently mixed past and present tenses in his answers to Anderson's and Chambers's questions. But Anderson never gauged Merida-Tavera's ability to understand or to speak English. Anderson testified that he was not worried about the language barrier and therefore did not pause to consider whether to get an interpreter.

After some preliminary questions, Anderson asked Merida-Tavera to "explain to [Anderson and Chambers] what happened." (*Id.* at 03:58–04:02.) Merida-Tavera answered:

> Oh, I mean, yes, I—I—I park it. And like, they tried to—to catch me. I mean, [unintelligible] yeah, they catch me. Like, they broke my window. *(\*Merida-Tavera makes punching motion.\*)* Like, they push my window, like, no reason. So, I say hey wait, wait [unintelligible]. I tried to run. I do reverse. *(\*Merida-Tavera makes turning motion with hand.\*)* I tried to—to run away, but I hit—uh—his car. *(\*Merida-Tavera gestures behind him with his right thumb.\*)* [5]

---

[5] Several times during the FBI Interview, Merida-Tavera pointed behind him when referring to Guillen, Gamez, Maxwell, and/or Gloyd. (Ex. 1-a-2 at 04:26–04:27, 04:34–04:36, 04:51–04:53.) One obvious explanation for such gestures is that Merida-Tavera was pointing toward the door from which the agents had exited mere minutes before. (*See* Ex. 1-a-1 at 00:00–02:31 (Three of the four agents—including Gamez—exited the room where the interview was taking place.); Ex. 22 at 11, 13 (Gamez rented the Wagoneer.).)

(*Id.* at 04:05–04:27.)[6] Minutes later, Anderson asked Merida-Tavera to repeat what happened, starting "from the beginning." (Ex. 1-a-3 at 01:56–02:09.) Merida-Tavera obliged, stating:

> The first thing that happen—okay. I stop. *(\*Merida-Tavera points to the side with his right hand.\*)* When I stop, I see—I see—I see them. *(\*Merida-Tavera gestures forward and slightly upward with his right hand.\*)* Because—uh—was . . . . *(\*Merida-Tavera holds up four fingers.\*)* Uh, like, probably, maybe like four cops are there. *(\*Merida-Tavera holds up four fingers again.\*)* Maybe like four different cops. And so, they tried to close my way. *(\*Merida-Tavera makes encircling motion with both arms.\*)* They closed my way. So, [unintelligible] when I see them, I say, oh, those are the guys catch people. So, I get in reverse. *(\*Merida-Tavera makes turning motion with hands.\*)* I tried to—to—uh—run away, but [unintelligible] . . . .

(*Id.* at 02:09–02:39.)

During the FBI Interview, Merida-Tavera was forthright that he is in the United States illegally, and he was unequivocal that his undocumented status is the reason why he tried to flee. In addition, he gave this explanation for his flight:

| | |
|---|---|
| Merida-Tavera: | Who's gonna—Who's gonna stay? Or who's gonna wait to—to like . . . . |
| Chambers: | But if you've done nothing wrong, why didn't you just let the[] [agents] contact you? |
| Merida-Tavera: | Yeah, you know, yeah, I—I think that maybe it's my mistake. Like, you know, like, peoples [sic]—they get when—when—see something like that, a gut reaction. So, I'm not gonna stay—like, what's going on here, you know. |

(*See id.* at 00:53–01:38.)

Multiple times, Merida-Tavera demonstrated his understanding that he was apprehended solely because he is in the country illegally. (*See, e.g.*, *id.* at 01:39–01:53 ("But I don't do nothing

---

[6] The Government provided a transcript of the FBI Interview. (Ex. 1.) But having watched the interview many times over, the Court sees fit to transcribe (and quotes herein) the interview as the Court hears and understands it. The Court notes that the Government's proposed instructions incorporate § 1.49 of the Fifth Circuit's jury instructions, entitled "Cautionary Instruction During Trial—Transcript of Tape-Recorded Conversation." (Doc. 40 at 2.) That section provides: "[I]f you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent. It is what you hear on the tape [recording] that is evidence, not the transcripts." FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: CRIMINAL § 1.49 (2024).

wrong. I never get, like, in trouble right here. I pay insurance. I pay every ticket that—that I get, I pay."); *id.* at 03:01–03:09 ("Yeah, they put me in their car. They—they tried to pull me—pull me on the ground. But [unintelligible] I didn't do anything."); *id.* at 03:45–03:49 ("They catch me— they catch me for like no reason.").)

Anderson and Chambers at no point suggested to Merida-Tavera that the collision was a reason for his arrest. (*See, e.g.*, *id.* at 03:50–04:06 ("Well, the reason [why the agents arrested you] is you're here illegally, which is against the law. And you tried to evade arrest. That's why all of that happened.").) And crucially, neither Anderson nor Chambers specifically asked Merida-Tavera about his intent—e.g., whether he knew that the Wagoneer had pulled behind the Mustang or whether he knew that he would hit the Wagoneer when reversing. Rather, they asked broad, open-ended questions which put the onus on Merida-Tavera to volunteer (in English) more definite exculpatory statements. (*See id.* at 03:21–03:25 ("Is there anything you want to add? Anything else you want to say?"); 03:35–03:39 ("Is there anything else important about what happened today that you want us to know?").)

### C.    Jail Calls

At trial, the Government presented translations of excerpts from three out of roughly fifty jail calls between Merida-Tavera and another person. The first of these translated jail calls took place on December 14, 2025. The Government isolates the following statement by Merida-Tavera:

> [W]hen the lady comes to pay, show the fucking videos, because I, yes, I did, I did crash into him, but tell them that I crashed into them, because when I reversed . . . I didn't know it was a patrol car, because he signaled to me to go in. I never thought it was a patrol car. So, when I . . . I reversed because the, the guy that I saw was, he was in front. So, he was in front and I . . . it was a police officer. I saw the green vest and everything, but--

(Ex. 12-a at 17.)

FBI Linguist Huerta testified that she translated some of the jail calls. She acknowledged that the quality of the recordings was generally poor: The interlocutors spoke quickly and, in many cases, unintelligibly. They regularly talked over one another. Merida-Tavera stuttered. And there were background noises, including other voices. It was therefore difficult to parse everything. Huerta also acknowledged that there are Spanish dialects, including different dialects within Merida-Tavera's home country of Mexico. The upshot is that the same jail call could be translated in slight but meaningfully different ways. Indeed, the Defense introduced alternative translations of two jail calls. In the Defense's translation of the December 14 jail call, Merida-Tavera said:

> [W]hen the lady comes to pay, show the fucking videos because-- I, yes, I did hit him. But tell him that I hit him because when I reversed, I didn't know it was a patrol car, because he let me go in front of him to go through. I never imagined that it was a patrol car. So then when I-- I reversed, because-- the, the guy that I saw was in the front, so he was in front, and I-- it was the police officer, I saw his green vest and everything, but from behind [UI].

(Ex. Def.-1 at 13–14.)[7]

In the second jail call—dated December 19, 2025—Merida-Tavera's interlocutor asked, "Because when, when you hit the car by going in reverse, what were you trying to do?" (Ex. 13-a at 10.) Merida-Tavera responded: "Nothing. I was just, I wanted to run and that's it." (*Id.*) The Defense does not dispute this translation. Finally, in a third jail call—dated December 21, 2025—the speakers had the following exchange about the collision:

> EMT:  [OV] --the thing is that I [UI] by accident. [UI] no, no, it was not my intention, dude. I did it--
> UM2:  [OV] Because with the intention--
> EMT:  --because, because [UI]--
> UM2:  [OV] --you, did you resist, dude?
> EMT:  No, I didn't resist. The thing is that I--well, I was going to run, yes.
> UM2:  Uh-huh.
> EMT:  [OV] I--I was going to run from them because, because--well, there was, there was a big truck at the entrance. I--I never imagined that it was--that it was, that it was a patrol. There was a truck--

---

[7] "UI" means "unintelligible." "OV" means "overlapping voices."

UM2:   [OV] Yes, dude.
EMT:   --one of them was a Suburban, dude. It was--
UM2:   [OV] It's because it wasn't a patrol unit, dude.
EMT:   No, it wasn't, that's why--it was a Suburban that--that went in.
UM2:   [OV] Yes, yes, uh-huh.
EMT:   It was a patrol. So, that dude was in the way, then--
UM2:   [OV] Mm-hmm.
EMT:   --at the moment that I, that I went by, he let me through, he gave me [UI] because he saw that . . . I mean, I stayed behind a bit. And I--I--
UM2:   [OV] Mm-hmm.
EMT:   --the dude moved so then I went in. In that moment that I went into the--the parking lot, I saw the cop that was . . . in other words, I realized it was . . . that dude that was behind me--
UM2:   [OV] He was--
EMT:   --I didn't even know he was immigration. I noticed the one that was--
UM2:   [OV] He was wearing a mask, right?
EMT:   No, no, I noticed the one that was on the side. There was a truck, I think--
UM2:   [OV] Yeah.
EMT:   --next to where I parked.
UM2:   [OV] A black truck?
EMT:   Uh-huh, that one. That's the one--

(Ex. 14-a at 16–17.) The Defense's translation is generally consistent but fills in some gaps:

EMT:   --I hit it by accident, that hit, it wasn't, wasn't my intention, dude. I did it because--
UM2:   [OV] [UI]
EMT:   --because--
UM2:   [OV] Did you--you resist, dude?
EMT:   No, no, I didn't resist. What happened is that I-- well, or that is, I was going to run, yes.
UM2:   Uh-huh.
EMT:   --I was going to run because, because, well, at the entrance, there was, there was a big truck, I, I never imagined it was a patrol. There was a truck--
UM2:   [OV] Yes, dude.
EMT:   --one, it was a Suburban, dude.
UM2:   It wasn't a patrol officer, dude.
EMT:   No, it wasn't-- it was a Suburban.
UM2:   [OV] Yes, yes, uh-huh.
EMT:   So, then that, that one was in the way. So then--
UM2:   [OV] Mm-hmm.
EMT:   --when I went by in the truck, he gave me the right-of-way, he gave me-- because he saw there was a gap [PH] in the back, and I, I--
UM2:   [OV] Mm-hmm.

15

EMT:    --he saw the guy, so then I went in. And once I got in the, in the parking lot, I saw the police officer that was--or that is, I didn't notice that he was--the guy that was in the back--

UM2:    [OV] Uh--

EMT:    --I didn't even notice that he was Immigration. I noticed the one that was--

UM2:    [OV] He was wearing a hoodie, right?

EMT:    No, no, I noticed the one that was on the side. He was in a truck, I think. On the side of the--

UM2:    [OV] A black truck.

EMT:    --[UI] Uh-huh, that's, that's the one I saw. . . .

(Ex. Def.-3 at 12–13; *see also* Doc. 49 at 14 (comparing transcriptions of a similar exchange).)

## IV.    LEGAL STANDARDS

18 U.S.C. § 111(a)(1) provides in relevant part:

> Whoever . . . forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties . . . shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

Sub-section (b) is entitled "Enhanced Penalty" and provides:

> Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

*Id.* § 111(b).[8] The Fifth Circuit has clarified that 18 U.S.C. § 111 "create[s] three separate offenses": simple assault, under sub-section (a); "more serious assaults" not involving dangerous weapons, under sub-section (a); and "assault with a dangerous weapon," under sub-section (b).[9]

---

[8] The Court emphasizes that the possible punishment does not factor into its decision here. (*See* Doc. 40 at 1 (incorporating FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: CRIMINAL § 1.22 (2024) ("You should not be concerned with the punishment in any way.")).) Nor is the Court concerned with the difference in punishment between § 111(a)(1) and § 111(b). *See* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: CRIMINAL § 1.22 (2024).

[9] A person can also violate sub-section (b) by inflicting "bodily injury" during the commission of any of the acts enumerated in sub-section (a). *E.g.*, *United States v. Hernandez-Hernandez*, 817 F.3d 207, 213 (5th Cir. 2016). But here, the Government does not allege that Merida-Tavera inflicted bodily injury. (*See* Doc. 1.)

*United States v. Ramirez*, 233 F.3d 318, 321 (5th Cir. 2000) (quoting *United States v. Nunez*, 180 F.3d 227, 233 (5th Cir. 1999)); *accord United States v. Hazlewood*, 526 F.3d 862, 865 (5th Cir. 2008); *United States v. Hernandez-Hernandez*, 817 F.3d 207, 212–13 (5th Cir. 2016).

The Government has charged Merida-Tavera with "simple assault" and "assault with a dangerous weapon" (i.e., a motor vehicle). (*See* Doc. 1.) The parties agree that the Fifth Circuit's jury instructions capture the elements of these offenses. (Docs. 37, 40.) The Fifth Circuit instructs:

> Title 18, United States Code, Section 111(a)(1) makes it a crime for anyone to forcibly assault, [resist] [oppose] [impede] [intimidate] [interfere with] any person designated as a federal officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while the officer is engaged in the performance of his [her] official duties.
>
> For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> *First*: That the defendant forcibly assaulted [resisted] [opposed] [impeded] [intimidated] [interfered with] a federal officer . . . ;
>
> *Second*: That the federal officer was forcibly assaulted [resisted] [opposed] [impeded] [intimidated] [interfered with] while engaged in the performance of his [her] official duty or on account of the performance of official duties; and
>
> *Third*: That the defendant did such acts intentionally[.]

FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: CRIMINAL § 2.07 (2024). For assault with a dangerous weapon, the Fifth Circuit adds:

> [*Fourth*: That in doing such acts, the defendant used a deadly or dangerous weapon or inflicted bodily injury.]

*Id.* A "deadly or dangerous weapon" is "any object capable of inflicting death or bodily injury." *Id.* Here, the parties have stipulated that a motor vehicle can qualify as a dangerous weapon.

As used in 18 U.S.C. § 111, the term "forcibly" is a series qualifier: It "modifies all of the acts rendered unlawful by § 111(a)(1)." *Hazlewood*, 526 F.3d at 865 (citing *United States v.*

17

*Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002); *United States v. Schrader*, 10 F.3d 1345, 1348 (8th Cir. 1993)). The upshot is that "[f]orce is a necessary element of any § 111 violation." *Hazlewood*, 526 F.3d at 865 (quoting *Schrader*, 10 F.3d at 1348). Here, the Court need not reach the issue of the level of force required to sustain a conviction under § 111(b). But the Court pauses to note that the Fifth Circuit has long expressed concern with the §111's failure to "specify the level of force required for a violation" of this sub-section. *See Hernandez-Hernandez*, 817 F.3d at 215 ("Unfortunately, § 111 is not a model of clarity . . . ."); *see also Sophin v. United States*, 153 F. Supp. 3d 956, 960, 963–64 (W.D. Tex. 2015) ("[W]hile the defendant must do more than merely refuse to cooperate with the federal agent, '[w]hether a person has opposed the efforts of federal agents with sufficient force . . . can . . . be a troublesome question of degree.'" (quoting *United States v. Cunningham*, 509 F.2d 961, 963 (D.C. Cir. 1975))); *United States v. Contreras*, 800 F. Supp. 3d 709, 713 (W.D. Tex. 2025) ("Section 111(a)(1) has been the subject of frequent comment for its ambiguity."). The circumstances of the instant case thoroughly demonstrate that the Fifth Circuit's concern is well-founded.

Courts in this circuit have given the terms "forcibly," "forcible," and "force" their ordinary meanings. *See, e.g.*, *United States v. Quintanilla-Chavez*, 807 F. Supp. 3d 641, 654 (W.D. Tex. 2025) (citing *Forcible*, *Black's Law Dictionary* (10th ed. 2014))[10]; *see also Forcible*, *Black's Law Dictionary* (12th ed. 2024) ("Effected by force or threat of force *against opposition or resistance*." (emphasis added)); *Force*, *Black's Law Dictionary* (12th ed. 2024) ("A violent physical action; physical compulsion or constraint *of someone or something* . . . ." (emphasis added)). Applying

---

[10] *Accord Sophin*, 153 F. Supp. 3d at 968–69 ("Following the Supreme Court's analysis, the Court defines 'force' in the context of § 111 using the ordinary meaning."); *Contreras*, 800 F. Supp. 3d at 712 ("The Court holds that the ordinary definition of 'forcibly' as used in Section 111(a) is consistent with Fifth Circuit case law . . . ."); *see also id.* at 714 ("Typically, when a court is faced with an undefined statutory term, the court 'give[s] the phrase its ordinary meaning.'" (quoting *Johnson v. United States*, 559 U.S. 133, 138 (2010))).

18

the ordinary meanings of such terms, the Court determines that, here, the force in question must have been "directed *toward or against*" Guillen and Gamez. *See Quintanilla-Chavez*, 807 F. Supp. 3d at 654 (emphasis in original); *Sophin*, 153 F. Supp. 3d at 964 ("While Sophin did not merely refuse to cooperate, and instead drove away from [the agent], there is no evidence that during the thirty-second encounter, Sophin used any force directed at [the agent].").

The Court will assume, *arguendo*, that § 111 requires only general intent. *See, e.g.*, *United States v. Cross*, No. 22-184, 2024 WL 758609, at *2–5 & n.44 (E.D. La. Feb. 23, 2024) (collecting cases); *see also United States v. Ricketts*, 146 F.3d 492, 497 (7th Cir. 1998) ("A violation of § 111 requires proof that the defendant intended to commit a forcible assault."). "General intent is broadly (and somewhat circularly) defined as the state of mind required for certain crimes not requiring specific intent or imposing strict liability." *United States v. Berrios-Centeno*, 250 F.3d 294, 298–99 (5th Cir. 2001); *see also id.* at 299 (noting that other circuits have held that "specific intent concerns willful and knowing engagement in criminal *behavior*, while general intent concerns willful and knowing *acts*"); *United States v. Kimes*, 246 F.3d 800, 803 n.1, 806–07 & n.4 (6th Cir. 2001) ("The violation of a general intent statute . . . requires only that a defendant intend to do the act that the law proscribes." (cleaned up)); *United States v. Kleinbart*, 27 F.3d 586, 592 n.4 (D.C. Cir. 1994) ("A general intent crime requires the knowing commission of an act that the law makes a crime."); *id.* at 592 (approving the district court's instruction to the jury that "[t]o show general intent, the Government must prove beyond a reasonable doubt that the defendant knowingly, consciously, and voluntarily committed an act which the law makes a crime").

Here, Merida-Tavera has acknowledged that, at the time of the collision, he was trying to flee. It is not enough, however, that Merida-Tavera intended to resist apprehension. Rather, he must have intended to *forcibly* resist. "Otherwise, anyone who opposes arrest by merely backing away

19

from an officer with his hands up would violate § 111(a) . . . ." *Quintanilla-Chavez*, 807 F. Supp. 3d at 654; *see also Sophin*, 153 F. Supp. 3d at 966–70 (discussing *Johnson v. United States*, 559 U.S. 133 (2010)). And anyone who opposes arrest by merely backing up his vehicle would arguably violate § 111(b). *Cf. Quintanilla-Chavez*, 807 F. Supp. 3d at 654; *Arrington*, 309 F.3d at 45 & n.9 ("The use of a car purely for flight would not satisfy the fourth element of § 111(b) . . . ."); *see also United States v. Williams*, 602 F.3d 313, 317–18 (5th Cir. 2010) (citing *Arrington*, 309 F.3d at 44, with approval).

It is also undisputed that there was a collision here: The Mustang hit the Wagoneer. *Cf. Sophin*, 153 F. Supp. 3d at 964–65 ("None of the evidence demonstrates that Sophin's act of driving away from the Checkpoint in his Dodge Magnum was forceful. . . . [A]s Agent Mossman acknowledged, essentially, Sophin pulled away." (cleaned up)).

But like the consensus over Merida-Tavera's intent to flee, the fact of collision must not distract from the question at the heart of this case: Did Merida-Tavera have the requisite intent to *forcibly* resist?[11] If, as Merida-Tavera was reversing, he did not know that the Wagoneer was behind the Mustang—or if he did not know that he would hit the Wagoneer when backing up— then he cannot be said to have knowingly forcibly resisted. (*See* Doc. 40 at 2 (incorporating FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: CRIMINAL § 1.41 (2024) ("The word 'knowingly' . . . means that the act was done voluntarily and intentionally, not because of mistake or accident.")).) In other words, under these circumstances, Merida-Tavera cannot be said to have acted with the (assumed) requisite general intent to forcibly resist. Indeed, the Government has repeatedly conceded that it must prove that Merida-Tavera "knew [that] he would hit the large white Jeep Wagoneer." (*See, e.g.*, Doc. 48 at 11 (discussing general intent and citing *Kleinbart*, 27 F.3d at

---

[11] The Court tends to use the verb "resist" but notes that, here, it is inconsequential which of the six verbs—assault, resist, oppose, impede, intimidate, interfere—is most appropriate.

592); Doc. 40 at 4 ("The government must prove that the defendant knowingly committed the acts that violated the law.").)

## V.   ANALYSIS

Given the evidence, there are at least three potential versions of the collision. The first possibility ("Version 1") is that, upon entering the parking lot, Merida-Tavera saw ICE Agents Maxwell and Gloyd through the front windshield of the black truck. Merida-Tavera could identify Maxwell and Gloyd as law enforcement by their tactical vests. After briefly parking the Mustang, Merida-Tavera hurriedly put the vehicle in reverse and backed up without properly checking his surroundings. He cut the steering wheel to the left so that he could exit through the alley from which he had entered—which was in the direction opposite the black truck, and which was the faster escape route.[12] (*E.g.*, Exs. 5-b, 5-c, 6-b, 6-c, 7-a, 7-c.) Merida-Tavera did not know that the Wagoneer had pulled behind the Mustang. As soon as the Mustang collided with the Wagoneer, Merida-Tavera realized that he was blocked in. He did not continue his flight; rather, he hit the brakes within 0.3 seconds of impact and peaceably surrendered to the agents. Because he did not know that the Wagoneer had pulled behind the Mustang, Merida-Tavera lacked the intent to forcibly resist. The collision was "the product of panic, distraction, poor judgment, [and/or] negligence." (*See* Doc. 49 at 1.) It was tortious but not criminal.

The second possibility ("Version 2") is that, upon entering the parking lot, Merida-Tavera realized that there were agents present. Likewise, Merida-Tavera was aware that the Wagoneer was

---

[12] In its post-trial brief, the Government contends that Merida-Tavera would not have tried to flee through the alley because the alley was narrow. (Doc. 48 at 17.) This argument is unpersuasive for several reasons. First, Merida-Tavera may have felt that the alley was his only realistic escape route given that the black truck was stationed between Merida-Tavera and the southern entrance/exit. Second, the alley was a more direct means of escape than the southern entrance/exit. And third, the Government has grossly overstated the narrowness of the alley. Indeed, at trial, the Government presented BWC footage of Guillen easily piloting the Wagoneer through the alley with only one hand on the steering wheel. (Ex. 3 at 01:37–02:00.) At one point, Guillen even passed another vehicle in the alley. (Ex. 2 at 01:35–01:46; *see also id.* at 01:47–01:54 (Guillen removed both hands from the steering wheel so that he could put on his tactical vest.).) As the Government has repeatedly emphasized, the Wagoneer was much larger than the Mustang.

pulling behind the Mustang or had already done so. In the 5.5 seconds between being blocked in by the Wagoneer and reversing, Merida-Tavera observed the sizeable gap between the orange Honda and the front of the Wagoneer. (Ex. 5 at 01:19; *see also* Ex. 4 at 05:24–05:34.) In a hurry, Merida-Tavera thought—in retrospect, incorrectly—that he could maneuver through that sizeable gap. He cut the steering wheel to the left in order to avoid the Wagoneer. But he misjudged and accidentally struck the Wagoneer's front right tire and bumper. Again, upon impact, Merida-Tavera stopped and peaceably surrendered to the agents. Although he saw the Wagoneer, Merida-Tavera evinced an intent to avoid the vehicle, not an intent to forcibly resist.

The third possibility ("Version 3") is the one which the Government advances. Merida-Tavera entered the parking lot, at which time he realized that there were agents in the black truck *and* in the Wagoneer. Merida-Tavera was also aware that the Wagoneer had pulled behind the Mustang and that he would not be able to avoid the Wagoneer when reversing. Nevertheless, Merida-Tavera "press[ed] the accelerator." (Doc. 48 at 1.) That is, Merida-Tavera knowingly "rammed his vehicle into the Jeep Wagoneer" as part of the escape attempt. (*Id.* at 8.)

The very fact that the evidence supports these competing versions of events demonstrates that the Government has failed to carry its burden of proving the element of intent beyond a reasonable doubt. But the Court underscores that, of the three versions outlined, the Government's seems the *least* plausible.

### A. Collision

#### 1. *Government's Evidence*

The Government points to a select few pieces of evidence from the collision itself. First, the Government contends that, given the size and positioning of the Wagoneer, "it would be reasonable to infer that [Merida-Tavera] did in fact see the [vehicle] when he hit the accelerator to

22

reverse." (Doc. 48 at 13.) Here, it is appropriate to remind the Government that it bears the burden of proof beyond a reasonable doubt.[13] The Court grants that the size and positioning of the Wagoneer were such that Merida-Tavera probably would have seen the Wagoneer behind him *had he checked his right-hand or rearview mirror*. But the Government presents no evidence that Merida-Tavera checked any of his mirrors or looked backward before reversing.[14] The Mustang did not have backup cameras or sensors. And the agents did not give Merida-Tavera any notice that the Wagoneer had pulled behind the Mustang. Guillen did not, for example, honk the horn, use his lights, activate a siren, or order Merida-Tavera to exit the vehicle.

Even if there were evidence that Merida-Tavera checked his mirrors or looked backward, such evidence would tend to rule out only Version 1 (i.e., that Merida-Tavera did not see the Wagoneer), not Version 2 (i.e., that Merida-Tavera was trying to avoid the Wagoneer).

Next, the Government observes that Merida-Tavera reversed at an angle (i.e., in a leftward direction). (Doc. 48 at 16–17.) As indicated above, this evidence only hurts the Government's case: It signals that Merida-Tavera was trying to escape via the alley and/or that he saw the Wagoneer and was trying to avoid it. Given the sizeable gap between the orange Honda and the Wagoneer, it is at least conceivable that, if Merida-Tavera did see the Wagoneer behind the Mustang, he nevertheless believed that he could maneuver past it without making contact. The Government tries to put a favorable spin on this evidence by incorporating Hyde's and Guillen's shared opinion—delivered in retrospect—that the collision was unavoidable. But Hyde and Guillen both testified that they did not know whether Merida-Tavera similarly thought that the collision was

---

[13] The fact that something was "blatantly available to be seen" does not independently permit the inference that it was seen. (*See* Doc. 48 at 12, 15–16, 22.)

[14] In order to bolster its argument, the Government seizes upon a few isolated statements and hand gestures made by Merida-Tavera during the FBI Interview. The Court will discuss these statements and gestures *infra*.

23

unavoidable. Indeed, there is no evidence from the collision revealing what Merida-Tavera knew or thought. Nor is there any evidence that, from his perspective, Merida-Tavera should have known that the collision was unavoidable. Given all of the evidence, the most reasonable inference to be drawn from the turning of the steering wheel is either that Merida-Tavera did not see the Wagoneer (Version 1) or that he was trying to avoid it (Version 2). In either case, the Court must conclude that Merida-Tavera *lacked* the requisite intent to forcibly resist.

Third, the Government emphasizes that, post-impact, Merida-Tavera was calm. (Doc. 48 at 12.) The Government argues that Merida-Tavera's post-impact demeanor casts doubt upon the narrative that Merida-Tavera was "impaired by panic" pre-impact. (*Id.* at 12, 20.)

The Court has reservations about the Government's characterization of Merida-Tavera's demeanor. (*See, e.g.*, Ex. 4 at 02:17–05:19.) Regardless, the possibility that Merida-Tavera was calm pre-impact does not make the Government's version of events (Version 3) any more likely. It does not, for example, establish that Merida-Tavera knew that the Wagoneer had pulled behind the Mustang or that he knew that he would hit the Wagoneer. And even if Merida-Tavera was not in a full-blown panic pre-impact, he could still have been acting hurriedly and without awareness or proper consideration of his surroundings.

As well, the Court notes that Merida-Tavera's "calm" demeanor post-impact cuts both ways. The Government's theory is that Merida-Tavera was so desperate to flee that he "rammed" his Mustang into the substantially larger and heavier Wagoneer. It is tough to reconcile that theory with the fact that, immediately after impact, Merida-Tavera hit the brakes and surrendered to the agents. At trial, at least one agent testified that it is common for a person to ram agents' vehicles multiple times when trying to escape. Why didn't Merida-Tavera do that here? Why didn't he aggressively resist arrest after being removed from his vehicle? The Government has no answer.

24

Fourth, Gloyd testified that he saw Merida-Tavera looking around and looking back at the Wagoneer while entering the parking lot. As Gloyd acknowledged during cross-examination, the fact that he could see Merida-Tavera through the windshield of the black truck means that Merida-Tavera could probably also see Maxwell and Gloyd, who were clearly identifiable as law enforcement by their tactical vests. For his part, Maxwell testified that, while he could see Merida-Tavera's outline, he did not recall Merida-Tavera looking around nervously, and he did not recall Gloyd's saying anything when the Mustang entered the parking lot. In any event, Gloyd testified that he lost sight of Merida-Tavera once the Mustang parked on the other side of the orange Honda. Gloyd's testimony in no way establishes that Merida-Tavera knew that the Wagoneer had pulled behind the Mustang or that Merida-Tavera knew that he would hit the Wagoneer.

Fifth, the Government notes that Guillen and Maxwell believed that the collision was an assault as soon as it occurred. (Doc. 48 at 13.) But the agents' subjective belief about the collision says nothing about Merida-Tavera's intent. Relatedly, the fact that Merida-Tavera did not tell the agents that the collision was accidental does not permit the inference that the collision was intentional. As the agents conceded during cross-examination, Merida-Tavera also said nothing to suggest that the collision was intentional or that he knew that he would hit the Wagoneer.

### 2. Other Evidence

Although, compared to one study, the Mustang's speed and acceleration rate were above average, the Mustang was not going fast. Over some 2.0 seconds, the Mustang reached a speed of 4.3 to 4.6 miles per hour. Going forward, it could reach 30 miles per hour in 2.2 seconds. (*See* Doc. 49 at 8.) It is therefore highly unlikely that Merida-Tavera was flooring it when reversing. The fact that Merida-Tavera was reversing at a walking speed is inconsistent with the Government's position that he was trying to "ram" the substantially larger and heavier Wagoneer out of the way.

25

Finally, Hyde testified that, based on footage of the incident, the sun was shining on the back of the Mustang. Thus, even if Merida-Tavera looked in his rearview mirror or looked backward, his vision may have been obscured. The evidence from the collision supports Version 1 or Version 2 over Version 3.

### B.    FBI Interview

#### 1.    Comment

At the outset, it is necessary to make a comment about any evidence derived from Merida-Tavera's interview with FBI Agents Anderson and Chambers: Having watched and re-watched the recorded interview, it is readily apparent to this Court that, while Merida-Tavera has some ability to understand and to speak English, it is limited.

Throughout the interview, Merida-Tavera used awkward words and phrasing. (*See, e.g.*, Ex. 1-a-2 at 04:05–04:27 ("Like, they push my window, like, no reason. . . . I tried to run. I do reverse.").) Many of his sentences were tough to follow and/or incomplete. (*See, e.g.*, Ex. 1-a-3 at 00:53–01:38 ("Like, you know, like, peoples—they get when—when—see something like that, a gut reaction. So, I'm not gonna stay—like, what's going on here, you know."); *id.* at 01:39–01:53 ("But I don't do nothing wrong. I never get, like, in trouble right here. I pay insurance. I pay every ticket that—that I get, I pay.").) He mixed present and past tenses. (*See, e.g.*, Ex. 1-a-2 at 04:05–04:27 ("Oh, I mean, yes, I—I—I park it. And like, they tried to—to catch me. I mean [unintelligible] yeah, they catch me. Like, they broke my window.").) And he frequently confused the chronology of events, even beginning his account *in medias res*, with the smashing of the window. (*Id.*; Ex. 1-a-3 at 01:57–02:49.)

26

Anderson agreed that Merida-Tavera clearly did not speak English as a first language.[15] Nevertheless, Anderson did not gauge Merida-Tavera's ability to understand or to speak English. He did not so much as consider whether to get an interpreter. He conducted the interview exclusively in English. At trial, Anderson insisted that he could understand Merida-Tavera.[16] Likewise, the Government now insists that, because Merida-Tavera's responses "were sensible and context appropriate," he must have understood Anderson's questions. (Doc. 48 at 14.) But the Government brushes past the more pressing issue: Did Merida-Tavera comprehend well enough to give exact answers? And relatedly, was Merida-Tavera's command of the English language strong enough that he could say exactly what he meant?[17] About this, the Court has strong doubt.

### 2. *Government's Evidence*

The Government isolates statements and gestures made by Merida-Tavera during the interview in order to establish Merida-Tavera's intent. (*See id.* at 13–15.) As the Defense has noted, the Government does not account for the fact that Merida-Tavera was describing the collision to the FBI agents in retrospect, with a fuller understanding of what had transpired.

---

[15] For its part, the Government has described Merida-Tavera's English as "broken." (Doc. 48 at 21.)

[16] Conspicuously, though, Anderson testified at multiple points about how he *interpreted* Merida-Tavera's answers. For example, when asked whether he understood the rights enumerated in the Advice of Rights form, Merida-Tavera answered, "I think that—yeah—that better to—to—like, not to say nothing right now because . . . ." (Ex. 1-a-2 at 00:39–00:46.) At trial, Anderson testified that he understood Merida-Tavera's answer to be a question about the right to remain silent, as opposed to an ambiguous invocation of that right. (To the Court, it seems just as likely that Merida-Tavera was trying to invoke the right.) Similarly, Merida-Tavera at one point stated: "I think that maybe it's my mistake. Like, you know, like, peoples—they get when—when—see something like that, a gut reaction. So, I'm not gonna stay—like, what's going on here, you know." (Ex. 1-a-3 at 00:53–01:38.) To the Court, it seems that Merida-Tavera meant to say that the collision was an accident but used the synonym "mistake." Anderson, on the other hand, testified that he understood "mistake" to mean a mistake in judgment (i.e., a bad decision), although he conceded that Merida-Tavera may have meant that it was an accident. In any event, the fact that Anderson (and now the Court) must undertake to divine Merida-Tavera's meaning is telling. And the Court reiterates that neither Anderson nor Chambers took the opportunity to ask clarifying questions during the FBI Interview.

[17] As anyone who has studied another language surely appreciates, comprehension is a category apart from expression. Even if Merida-Tavera understood perfectly what Anderson was asking, it would not automatically follow that Merida-Tavera had the ability to respond completely or even adequately.

The Government first emphasizes that Merida-Tavera twice said, "They closed my way," while making an encircling gesture with his arms. But it is wholly unclear—given the mixing of tenses and chronology—whether Merida-Tavera meant to say that, in the moment, he realized that there were agents on both sides of the parking lot or that, with the benefit of hindsight, he knew where the agents were positioned. And even if Merida-Tavera meant to say that, in the moment, he knew that the agents had closed his way, the Court cannot make the additional inferential leap that Merida-Tavera also knew that the Wagoneer had pulled behind the Mustang, as that is separate from "clos[ing] [a person's] way."[18]

The Government also points to the following statement by Merida-Tavera: "The first thing that happen—okay. I stop. When I stop, I see—I see—I see them." (Ex. 1-a-3 at 02:09–02:39.) The Government repeatedly asserts that, when making this statement, Merida-Tavera raised his right hand and "point[ed] to where the rearview mirror would be." (Doc. 48 at 14.) Indeed, this gesture is the Government's *only* evidence that Merida-Tavera checked his rearview mirror before reversing. But the Court disagrees with the Government about Merida-Tavera's gesture. (Ex. 1-a-3 at 02:13–02:22.) Initially, Merida-Tavera gestured forward and perhaps slightly upward with his right hand. (*Id.* at 02:13–02:15.) He then held up four fingers at the same time as he said, "Because—uh—was . . . . Uh, like, probably, maybe like four cops are there." (*Id.* at 02:15–02:22.) After pausing, he repeated the second gesture, saying, "Maybe like four different cops." (*Id.*)[19]

---

[18] As an illustration of the point, Merida-Tavera was ostensibly referring to the Wagoneer *and to the black truck* when he said, "They closed my way." Yet no one suggests that the black truck pulled behind the Mustang. Rather, it is understood that the black truck was stationed between Merida-Tavera and the southern entrance/exit.

[19] While trying to wave away the mention of "four cops," the Government impliedly concedes that Merida-Tavera's statements about the incident are more appropriately understood as objective narration delivered in hindsight rather than Merida-Tavera's subjective understanding of the incident as it was unfolding. (*See* Doc. 48 at 15 ("[I]t seems unlikely that the Defendant meant that he saw all four cops contemporaneously before the crash, since Agent Gamez was in the back of the Jeep Wagoneer.").)

Merida-Tavera's initial gesture is ambiguous. The Court cannot rule out the Government's characterization—that Merida-Tavera was motioning toward an imaginary rearview mirror. (Ex. 1-a-3 at 02:09–02:39.) But it could just as easily be the case that Merida-Tavera was gesturing through an imaginary windshield (e.g., toward the agents in the black truck, who would have been above Merida-Tavera's eye-level). Or it could be the case that Merida-Tavera was simply talking with his hands, perhaps to compensate for his limited English. Merida-Tavera's contemporaneous statements do not clarify his initial gesture, in part because Merida-Tavera was plainly speaking in hindsight and was once again mixing chronology.[20]

Even if the Government is correct that Merida-Tavera was gesturing toward an imaginary rearview mirror, that evidence would cast doubt upon Version 1 but not Version 2. In other words, the Government would still have no evidence that Merida-Tavera intended to hit the Wagoneer or that he knew that he would hit the Wagoneer. And evidence such as the turning of the steering wheel would still suggest that Merida-Tavera was trying to avoid, not ram, the Wagoneer.

### 3. Other Evidence

Mindful of the concerns expressed above, the Court notes that other statements by Merida-Tavera tend to reflect that the collision was accidental. When he first recounted the incident, Merida-Tavera stated, "I tried to—to run away, **but** I hit—uh—his car," indicating that the collision was not a part of his getaway plan. (Ex. 1-a-2 at 04:05–04:27 (emphasis added).) Similarly, when discussing why he fled from the agents, Merida-Tavera said, "I think that maybe it's my mistake." (Ex. 1-a-3 at 00:53–01:38.) And multiple times, Merida-Tavera demonstrated his understanding that he was apprehended solely because he is in the country illegally. (*See, e.g.*, *id.* at 01:39–01:53

---

[20] For example, Merida-Tavera said, "I see them," *before* saying, "[T]hey tried to close my way." (Ex. 1-a-3 at 02:09–02:39.) If, as the Government suggests, Merida-Tavera was indicating that he saw the Wagoneer in the rearview mirror, then the agents must have already closed his way, and the Wagoneer must have already pulled behind the Mustang. The statement that the agents "tried to close" Merida-Tavera's way would therefore be out of order.

("But I don't do nothing wrong. I never get, like, in trouble right here. I pay insurance. I pay every ticket that—that I get, I pay."); *id.* at 03:01–03:09 ("Yeah, they put me in their car. They—they tried to pull me—pull me on the ground. But [unintelligible] I didn't do anything."); *id.* at 03:45–03:49 ("They catch me—they catch me for like no reason.").)

The Government is correct, of course, that Merida-Tavera never explicitly stated during the FBI Interview that the collision was accidental. (Doc. 48 at 15.) But the Government takes the untenable position that, because Merida-Tavera has been in the country for a cumulative 17 or 18 years, he should have known that he needed to make a definite statement about his lack of intent. (*See id.*) After minimizing the clear issue of Merida-Tavera's limited ability to understand and to speak English—and after ignoring the foregoing statements suggesting that Merida-Tavera understood the collision to be accidental—the Government faults Merida-Tavera for failing to volunteer in more certain terms exculpatory details which trained interviewers did not specifically elicit from him. (*See, e.g.*, Ex. 1-a-3 at 03:21–03:39, 03:50–04:06.) Such an attempt to shift the burden onto the defendant is inconsistent with the Government's fundamental duty to prove its case beyond a reasonable doubt.

C.    **Jail Calls**

The Court has concerns with the transcripts of the jail calls, not wholly unlike its concerns with the FBI Interview. At trial, FBI Linguist Huerta agreed that the quality of the recordings was generally poor and that it was difficult to parse everything. She also agreed that there are many Spanish dialects, including within Mexico. And here, the Court must consider competing translations of the same jail calls. These translations overlap considerably but also diverge on important points. The Government gives the Court no reason to prefer Huerta's translations over the Defense's. (*See, e.g.*, Doc. 48 at 17–18 & n.13 (acknowledging an important divergence).)

The Court need not dwell on the discrepancies between translations, however. The Government's use of the jail calls is generally unavailing. In particular, the second jail call—dated December 19, 2025—adds nothing to the Government's case. (*See* Ex. 13-a at 10.) Merida-Tavera has never disputed that he put the Mustang in reverse because he was trying to flee. (*Id.*) And although Merida-Tavera did not say in the second jail call that the collision was accidental, he also did not say that it was intentional or that he knew that he would hit the Wagoneer. (*See id.*) Once again, the omission of statements of accident or intent does not move the needle in either direction.

The Government isolates the following statement from the first jail call—dated December 14, 2025:

> [W]hen the lady comes to pay, show the fucking videos, because I, yes, I did, I did crash into him, but tell them that I crashed into them, because when I reversed . . . I didn't know it was a patrol car, because he signaled to me to go in.[21] I never thought it was a patrol car. So, when I . . . I reversed because the, the guy that I saw was, he was in front. So, he was in front and I . . . it was a police officer. I saw the green vest and everything, but--

(Ex. 12-a at 17.) This statement does not shine any additional light on the question of intent. It is yet another instance where Merida-Tavera acknowledged that he hit the Wagoneer. Further, this statement tends to support Version 1 or Version 2 over the Government's version, insofar as it shows that Merida-Tavera was not focused not on the Wagoneer but on the black truck—that is, on "the guy . . . in front" (Maxwell or Gloyd), who was identifiable as law enforcement. (*See id.*)

---

[21] The Government acknowledges that there is a dispute over the translation of the clause "because he signaled me to go in." (Doc. 48 at 18 n.13.) The Defense has translated the clause as "because he let me go in front of him to go through." (Ex. Def.-1 at 13–14.) The Government concedes that the record only includes footage of an unrelated hand signal, made by Guillen to Maxwell and Gloyd. (Doc. 48 at 18 n.13.) The Government does not rely on this disputed statement in its post-trial brief. (*See id.* at 17–18.) But the Court notes that, even if Guillen did signal to Merida-Tavera to enter the parking lot, such evidence would in no way support the inference that Merida-Tavera knew that the Wagoneer had pulled behind the Mustang, much less that Merida-Tavera knew that he would hit the Wagoneer. In other words, such evidence would not tend to make the Government's version of events more likely than either Version 1 or Version 2.

The Government argues that Merida-Tavera's story shifted in the third jail call—dated December 21, 2025. (*See* Doc. 48 at 18.) It is true that the third jail call is the first time when Merida-Tavera explicitly describes the collision as accidental. (Ex. 14-a at 16–17; Ex. Def.-3 at 12–13.) But Merida-Tavera's account of the incident coheres with and clarifies previous statements, including the statement made in the first jail call: Merida-Tavera was unaware that the Wagoneer was occupied by law enforcement. (*See* Ex. 14-a at 16–17.) Instead, he was focused on the black truck and "was going to run" from the agents occupying it. (*Id.*) Merida-Tavera's statement that he did not intend to hit the Wagoneer does not make the third jail call inconsistent with any other evidence. And the Court is hard pressed to see why the addition of this statement a mere 10 days after the collision is so inherently suspicious that it should be disregarded or else treated as support for the Government's version of events (Version 3).

In any event, the jail calls do not make Version 3 more likely than Version 1 or Version 2. On the contrary, the first and third jail calls support Version 1: Merida-Tavera was focused on the black truck, did not register that there were agents in the Wagoneer, and did not notice that the Wagoneer had pulled behind the Mustang. He therefore did not intend to hit the Wagoneer.

Altogether, the evidence supports at least three possible versions of events. In Version 1 and Version 2, Merida-Tavera plainly lacked the requisite intent to forcibly resist. The simple fact that these versions are plausible given all of the evidence signals that the Government has not carried its burden of proving the element of intent beyond a reasonable doubt.[22] But more importantly, the Government has not demonstrated that its version of events is even the most likely of the three. The Government's evidence of Merida-Tavera's intent is dubious, consisting

---

[22] It bears repeating, Merida-Tavera is presumed innocent. "The law does not require [him] to prove his innocence or [to] produce any evidence at all[,] and no inference whatever may be drawn from [his] election . . . not to testify." *See* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: CRIMINAL § 1.05 (2024) (cleaned up). Thus, it is not Merida-Tavera's burden to disprove the Government's version of events.

overwhelmingly of the Government's interpretations of statements made in "broken" English and corresponding hand gestures which are ambiguous at best. (*See* Doc. 48 at 21.) And even ignoring the many issues with the Government's evidence, there remains substantial, not just reasonable, doubt about Merida-Tavera's intent.

## VI.  CONCLUSION

Accordingly,

The Court finds Defendant Evodio Merida-Tavera **NOT GUILTY** of violation of 18 U.S.C. § 111(a)(1) or § 111(b).

Signed in Baton Rouge, Louisiana, on July 14, 2026.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**